# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

MICHAEL GLOETZNER,

                **Plaintiff,**

v.                                               **Case No:   4:14-cv-686-Orl-ACC-PRL**

LORETTA LYNCH, Attorney General,
Department of Justice, In Her Official
Capacity,[1]

                **Defendant.**

_____

## ORDER

This cause comes before the Court on the Motion for Summary Judgment of Defendant Loretta Lynch as Attorney General in her official capacity (Doc. 46), filed on May 18, 2016, to which Plaintiff Michael Gloetzner, filed a Response (Doc. 53), and Defendant has filed a Reply (Doc. 54). After careful consideration of the matter, the Court finds Defendant's Motion for Summary Judgment (Doc. 46) is due to be **GRANTED**.

## I. BACKGROUND

Plaintiff is currently a Deputy Marshal with the United States Marshals Service (the "Marshals Service" or "Defendant"), where he has been serving as a Deputy Marshal since January 1992. Doc. 50-1 (Gloetzner Dep.) at 6-7; Doc. 48-10 (Gloetzner Aff.) ¶ 3; Doc. 46-Ex. C at 87.[2] Plaintiff was born in 1966, and was 45 years old at the time he initiated an internal (Equal

---

[1] Loretta Lynch became Attorney General on April 27, 2015.   Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Eric H. Holder, Jr.'s successor as Attorney General, Loretta Lynch, is automatically substituted as the Defendant in this action.

[2] For consistency sake, the Court uses the PDF pagination in the upper right hand corner for Defendant's Exhibits A-O, as explained in Doc. 46 at 1-2.

Employment Opportunity ("EEO") complaint by seeking counseling from the Marshals Service's internal EEO Office in June 2012. Doc. 50-1 at 6-7; Doc. 48-10 ¶ 2.

From 2003 through September of 2014, Plaintiff was assigned to the Marshals Service in the Tallahassee Office of the Northern District of Florida (the "Tallahassee Office"). Doc. 48-10 ¶ 3. Prior to transferring to Tallahassee in 2003, Plaintiff had served as a Deputy Marshal in the Southern District of Florida for approximately fourteen years. Doc. 48-10 ¶ 4. Plaintiff was transferred to the Tallahassee Office in 2003 "against his will"[3] after he received a credible death threat. Doc. 46-Ex. K at 317, 462. Since September 2014, Plaintiff has been assigned to the Marshals Service in the Southern District of New York. Doc. 1 at 6.

Plaintiff's age-related discrimination claims in this case arise out of treatment that occurred between 2012 and 2014 while he was assigned to the Tallahassee Office. *Id.* During the relevant time period, Plaintiff's direct supervisor in the Tallahassee Office was Supervisory Deputy U.S. Marshal Scott Wilson (born 1971), whose supervisor was Assistant Chief Deputy[4] U.S. Marshal Kelly York (born 1956); York reported to the Chief Deputy United States Marshal Brian Nerney (born 1966) who in turn reported to the United States Marshal Edward Spooner (born 1950). Doc. 46-Ex. A, 220, 234, 248, 269.

In early June 2012, Plaintiff told Assistant Chief Deputy York that he would "really like to go" to training to become a firearms instructor and to fitness training to become a fitness coordinator who would administer fitness evaluations for the office.[5] Doc. 48-10 ¶¶ 9, 11; Doc. 50-1 at 32. Assistant Chief Deputy York asked Plaintiff to "let him know where it was and how much it costs." Doc. 50-1 at 32.

---

[3] In 2008, Plaintiff wrote a letter to the Director of the Marshals Service "describ[ing] the problems that [he has] encountered since [he] was sent to this district [NDFL] against [his] will." Doc.46-Ex. G at 99.

[4] At certain times during the relevant period, Kelly York is also referred to as Acting Chief Deputy.

[5] Plaintiff had apparently made similar requests to attend trainings during the years prior. Doc. 50-1 at 32; Doc.48-10 ¶ 9.

When Plaintiff asked Supervisory Deputy Wilson on June 19, 2012 for some leave to go to this training, Wilson told Plaintiff that he could not give Plaintiff the leave to attend the training because he was sending two other deputies: Josh Lowery to firearms training and Kerry Phillips to fitness training. Doc. 50-1 at 32-33. According to Plaintiff, when he asked, "[W]hy, I mean I have use or lose [annual leave]?" Supervisory Deputy Wilson replied: "I'm sending Josh [Lowery] to firearms school and Kerry [Phillips] to [fitness instructor] school." *Id.* at 32-33. Plaintiff asked, "[E]xcuse me?" to which Wilson replied, "I'm sending them." *Id.* at 33. Plaintiff said, "[B]ut you know that I'm the senior guy and I've been requesting that forever." *Id.* Wilson responded that he wanted to send a newer, younger deputy: "You're not going to be around for the next twenty years and Josh [Lowery] is. . . [I]t's a cost-effective decision." Doc. 50-1 at 33; Doc. 48-10, ¶ 9 ("Mr. Wilson told me that he could not send me to firearms instructor school, despite my repeated requests to attend, because he wanted to send a younger deputy who would be around for the next twenty years, unlike me, who was older.")[6]. Deputy Lowery, who attended the firearms training in July 2012 instead of Plaintiff, is now a firearms instructor for the Tallahassee Office. Doc.48-8 at 20; Doc. 48-12 at 36.

Despite Plaintiff's request to attend fitness instructor training[7], Deputy Kerry Phillips was selected to attend fitness instructor training instead. Assistant Chief Deputy York made the decision to send Deputy Phillips to the fitness instructor training[8]; he did not consider anyone else for the training. Doc. 48-14 (York Dep.) at 41-42. Supervisory Deputy Wilson subsequently assigned Deputy Phillips to an out of town judicial detail in Naples, Florida; Wilson stated to

---

[6] Another deputy, Andrew Kilgore, overheard the conversation from his adjoining office, but he testified that he did not remember the "exact content" or the "specific wording," only Mr. Wilson saying he had to "plan ahead," "look to the future," and "essentially that meant Josh Lowery and not [Plaintiff] who"—in Kilgore's recollected impression—"was too old." Doc. 48-17 (Kilgore Jan. 12, 2016 Dep.) at 17-18 Doc. 48-18 (Kilgore June 13, 2014 Dep.) at 8-9.

[7] While Assistant Chief Deputy York remembered Plaintiff asking about the firearm instructor training, York testified that Plaintiff did not ever ask him about attending the fitness training. Doc. 48-14 (York Dep.) at 37.

[8] This training is sometimes referred to as "FIT" or "FIT training" by the parties.

Plaintiff that he assigned Phillips specifically because he is a younger, newer deputy. Doc. 48-10 ¶ 11. Assistant Chief Deputy York subsequently told Plaintiff (after York became aware that Plaintiff had filed an EEO complaint) that he (York) was the one who made the decision to send the younger deputy to training because Wilson had advised York that it would be better to send the newer, younger deputies. Doc. 48-10 ¶ 13.

Plaintiff sought counseling regarding alleged age discrimination from the internal Marshals Service EEO office on June 29, 2012; an EEO counselor was assigned to review Plaintiff's claims on July 3, 2012. Doc. 48-10 ¶ 12; Doc. 46-Ex. A at 53. The firearms instructor training program that Plaintiff had sought to attend took place from July 16, 2012 to July 27, 2012 at the Federal Law Enforcement Training Center in Glynco, Georgia. Doc. 46-Ex. L at 3-6. Plaintiff was on annual leave on July 23, 2012 through July 27, 2012. Doc. 46-Ex. C at 60.

Plaintiff was under investigation by the Marshals Service Office of Internal Affairs from July 5, 2012 through July 30, 2012 for false statements made in connection with three incidents in June 2012. *Id.*; Doc. 46-Ex. J at 855-60. Plaintiff was referred to Internal Affairs because on June 12 through 18, 2012 he was scheduled to work an operation in Panama City (about a two-hour drive from the Tallahassee Office); although he scheduled extra travel time, he did not attend the June 12 briefing and did not request leave, but his timesheet showed a full eight hour day, and he cost the district an extra expense when he missed the briefing. *Id.* at 860-61. He was also referred for his misleading statements regarding why he was reviewing video of another deputy in the cellblock (discussed in more detail below), and for reportedly providing conflicting information about destruction of the fleet management gas credit card assigned to his government vehicle. *Id.* After a review of the allegations, Internal Affairs determined that the matters were best addressed by district management. *Id.* at 856-57.

As a result of a separate district investigation, on July 27, 2012, Assistant Chief Deputy York issued a letter to Plaintiff proposing a five-day suspension for Plaintiff's failure to follow procedures in apprehending a fugitive three months before, on April 19, 2012. Doc. 46-Ex. I at 30-32; Doc. 46-Ex. M at 54-59. Marshal Spooner issued his final decision on the matter on September 10, 2012, requiring that Plaintiff be suspended for five days.[9] Doc. 46-Ex. A at 189; Doc. 46-Ex. I at 30-32; Doc. 48-10 ¶ 21.[10] Two days later, the management in the Tallahassee Office first learned that Plaintiff had contacted the Marshals Service EEO office in Washington, D.C. when an EEO investigator contacted by phone Supervisory Deputy Wilson and Chief Deputy Nerney on September 12, 2012. Doc. 46-Ex. A at 58, 189, 223, 237, 251; Doc. 46-Ex. M at 31-37. On September 17, 2012, the EEO Office notified Plaintiff of his right to file a formal complaint. Doc. 46-Ex. M at 2 ¶ 7. On October 3, 2012, Plaintiff filed his formal discrimination complaint with the Marshals Service EEO Office within the Department of Justice. Doc. 50-1 at 65. According to Plaintiff, at some point after this, Assistant Chief Deputy York asked Plaintiff whether he had a "666" under the band-aid on his forehead[11]. Doc. 48-10 ¶ 18.

During the Marshals Service's internal EEO investigation, Plaintiff alleged that he had been "harassed" by Marshals Service personnel since moving to the Northern District of Florida in 2003. Doc. 46-Ex. G at 119-21. Plaintiff testified that he had been disciplined on several occasions between 2005 and June 2012, but, he contends, these were based on "false" or "unfounded" allegations having to do with his ex-wife. Doc. 46-Ex. P at 98-100. Plaintiff received

---

[9]  Plaintiff was scheduled to serve the suspension from October 15 to October 19, 2012.

[10]  Plaintiff concedes that the investigation was begun a significant amount of time before he was actually suspended. Although Plaintiff alleged that the investigation "took almost a year to complete," it actually took five months, from April to September 2012. Doc. 48-10 ¶ 21.

[11]  Plaintiff stated in his affidavit that "he is Catholic and has very strong religious beliefs." Doc. 48-10 ¶ 18. Some Christians have connected the "666" to Satan as a symbol of evil. *See* "What is 666 in the Bible?" in U.S. Catholic, http://www.uscatholic.org/articles/201309/what-666-bible-27901 (visited on December 2, 2016).

performance evaluations of "successful" or "excellent" in 2010, 2011, and 2012. Doc. 48-1 to 48-3.

On December 12, 2005, Plaintiff received a letter of instruction for misconduct in the use of unnecessary force against a fugitive and threatening a witness based on an incident on January 14, 2004. Doc. 46-Ex. M at 39-40; Doc. 46-Ex. I at 2-7. On November 2, 2005, Plaintiff was suspended for one day for misconduct and misuse of office based on allegations that Plaintiff used his official position to pressure local police to serve a restraining order on his ex-wife (who simultaneously sought one against him) and allegations that Plaintiff threatened the local police officer to immediately serve the restraining order on her. Doc. 46-Ex. M at 42-44; Doc. 46-Ex. I at 64-66; Doc. 48-10 ¶ 5. From February 25, 2008 to March 15, 2008, Plaintiff was suspended for fourteen days for conduct unbecoming a deputy marshal when he misrepresented himself as his ex-wife on three occasions to gain access to her personal accounts and subsequently threatened her boyfriend. Doc. 46-Ex. M at 46-47; Doc. 46-Ex. I at 8-15. Plaintiff characterizes the latter two incidents as "solely related to the unfortunate and extremely hostile situation" surrounding his contentious divorce and custody battle. Doc. 48-10 ¶¶ 5-6.

From March 26 to March 28, 2012, Plaintiff was suspended for three days, by letter dated February 27, 2012, for failure to follow orders and a verbal altercation with another Deputy Marshal (Marty West), arising out of the handling of evidence (on August 5, September 27, and October 31, 2010) which Plaintiff believed had not been weighed or properly marked. Doc. 46-Ex. M at 49-52; Doc. 46-Ex. I at 16-22; Doc. 48-10 ¶ 7; Doc. 48-16 (Nerney Dep.) at 34.

Plaintiff has also been the subject of at least nine Marshals Service Internal Affairs investigations from 1999 through mid-2012 for: use of unnecessary and excessive force on a fugitive (February 2004); unprofessional conduct (January 2004); issues with a confidential informant (August 2004); conduct unbecoming a deputy marshal related to the service of the

restraining order against his ex-wife and his request to the local officer to change his report about their interaction (December 2004); conduct unbecoming a deputy regarding alleged threats to his ex-wife's boyfriend (July 2005); investigation into allegations of stealing a credit card from his ex-wife (November 2007); conduct unbecoming a deputy based on an incident with Deputy West (January 2011); failure to follow proper procedures for apprehending a fugitive (May 2012); and missing an operational briefing, causing an extra travel expense to the district, falsifying time and attendance sheet, and slandering district management (July 2012). Doc. 46-Ex. J at 1-1603 (Bates No. USMS001930-3532).

Following Plaintiff's filing of his formal EEO complaint with the Marshals Service on October 3, 2012, Plaintiff continued to receive corrective instructions and discipline while in the Tallahassee Office, some of which arose out of his conduct that occurred months prior to his June 29, 2012 EEO counseling and his October 3, 2012 formal EEO complaint.

Plaintiff was not allowed to attend any trainings and was not assigned to any out of town details between December 2012 and February 15, 2013. Doc. 48-10 ¶ 28. Specifically, Supervisory Deputy Wilson prevented Plaintiff from attending sex offender training on November 6, 2012, and declined to send Plaintiff to an out of town detail on November 29, 2012 even though he was next in line; Wilson sent a younger deputy instead. Doc. 48-10 ¶¶ 26-27; Doc. 48-17 (Kilgore Dep.) at 33. Chief Deputy Nerney also refused to assign Plaintiff to a security detail for Attorney General Holder. Doc. 48-10 ¶ 32. Wilson told Plaintiff that policy prevented such assignments while a deputy is under investigation, and that Internal Affairs forbid any training or out of town details;

Plaintiff was assigned more office work while restricted to in-office duty.[12] *Id.;* Doc. 50-1 at 44-45.[13]

On January 29, 2013, Plaintiff received a letter of instruction[14] (issued by Chief Investigator David Sligh[15]) for Plaintiff's failure to maintain and secure his Marshals Service badge and credentials on October 23, 2012.[16] Doc. 46-Ex. A at 322-28 (Sligh Aff.); Doc. 46-Ex. A at 426-37; Doc. 48-10 ¶ 30. The credentials have numbers, issued by the agency, that are unique and specific to each employee and are considered very sensitive government-issued items; Plaintiff's failure to properly secure them was in direct violation of Marshals Service policy directives and standards of conduct based on a concern that they could be used for gaining access to a federal courthouse or other federal facilities and/or in the commission of a crime. Doc. 46-Ex. A at 326.

Plaintiff was issued a suspension on February 11, 2013 by United States Marshals Service Chief Inspector Cathy Jones for an incident that occurred eight months prior on June 19, 2012. Doc. 46-Ex. I at 34-42; Doc. 50-1 at 128-33; Doc. 48-10 ¶ 31. Chief Inspector John Whitelock investigated the allegations against Plaintiff and recommended Plaintiff be suspended for fourteen days for displaying poor judgment and making a misleading statement regarding another deputy. Doc. 46-Ex. A at 299. Plaintiff had told Assistant Chief Deputy York that he saw Deputy Marshal

---

[12] Plaintiff alleges without any evidentiary support that he believed another employee, Nicole Gideon was assigned a judicial detail in Alabama, outside of her district in Jacksonville, for three weeks while she was under investigation. Doc. 50-1 at 99-100.

[13] After Plaintiff made his EEO complaint, Deputy Kilgore–although he was not regularly in the squad room any longer, only in passing–noted that "there was tension in the squad room" among the deputies, mid-level as well as senior managers, and the operational deputies (Phillips, Joy, and Lowery) started acting differently to Plaintiff. Doc. 48-17, 12-13.

[14] The USMS Agency Table of Offense and Penalties, used as a guideline in such cases, provided for a minimum of a reprimand for a violation of failure to secure the sensitive government issued items. Doc. 46-Ex. A at 327.

[15] Chief Investigator Sligh is from the Office of the Director, United States Marshals Service, San Antonio, Texas. Doc. 46-Ex. A at 324.

[16] Plaintiff reported that his credentials were taken from the locker room, and requested a separate investigation, but the only investigation conducted was by Chief Investigator Sligh. Doc. 48-10 ¶ 30.

Paul Joanos enter the cell block with a knife in his pocket on June 19, 2012. Doc. 50-1 at 128-33; Doc. 48-10 ¶ 31. York decided not to refer the allegation against Deputy Joanos for an internal affairs investigation because there was not a formal allegation, and it was a management decision to handle it within the district. *Id.*; Doc. 48-Ex. 14 at 59.

However, on August 1, 2012, Office of Internal Affairs referred the allegations against Plaintiff for his actions following the June 19, 2012 incident to the Northern District of Florida for review; management at the Tallahassee Office chose Alonda Guilbeau, Judicial Security Inspector, from the Western District of Louisiana to serve as the fact-finder, and she conducted a review of the allegations. Doc. 46-Ex. A at 299-306. Chief Inspector Whitelock, the Marshals Service Proposing Official for the incident, found that Plaintiff "displayed poor judgment when [he] conducted a personal investigation into the alleged misconduct" of Deputy Joanos. *Id.* A Court Security Officer ("CSO") stated in a sworn interview that during the week of June 11-15, 2012 Plaintiff had asked him to review the recorded video of the Tallahassee cellblock to determine if Deputy Joanos had possessed a pocket knife while he was handling a prisoner in the cellblock on June 7, 2012. *Id.* at 300. The evidence indicated that on June 19, 2012 Plaintiff approached the CSO to see what he had found on the video recordings, but because the CSO was uncomfortable "pitting one deputy against another," he showed Plaintiff how to retrieve the data himself. *Id.* When Supervisory Deputy Wilson observed Plaintiff reviewing the video and inquired about the reason, Plaintiff told him it was regarding some missing prisoner money; the CSO subsequently indicated that Plaintiff had not mentioned to him anything about reviewing the video for missing property, only whether Deputy Joanos had a knife in the cellblock. *Id.*

Chief Inspector Whitelock determined that Plaintiff exceeded his responsibility and "took matters into [his] own hands" by investigating the matter on his own "because [he] was dissatisfied with what [he] perceived to be no action on [his] complaint [against Joanos] by district

management." *Id*. "[M]isconduct investigations are conducted by the Office of Internal Affairs or designated to district or division management – and not to the complaining employee who is dissatisfied with the outcome of his complaint." *Id*. at 301.Chief Inspector Whitelock also determined that Plaintiff made a misleading statement to Supervisory Deputy Wilson when he said he was viewing the video because there was an issue regarding missing prisoner money. *Id*. On February 11, 2013, Chief Inspector Cathy Jones reviewed Whitelock's November 5, 2012 findings and proposed discipline of Plaintiff, and agreed that Plaintiff should be suspended without pay, but reduced the length of the suspension to a ten day suspension (from fourteen days), scheduled for March 6-15, 2013. Doc. 46-Ex. I at 37-39. Both Jones and Whitelock are employed at USMS Headquarters; neither is part of the management in the Northern District of Florida, and neither has any supervisory authority over Plaintiff. Doc. 46-Ex. M at 62-64.

After Plaintiff's reporting of the allegations of misconduct by Deputy Joanos, Supervisory Deputy Wilson denied Plaintiff the opportunity to act as the acting supervisor deputy marshal "because of the situation" Plaintiff was in; Wilson told Plaintiff that he "could not let [him] do it." Doc. 50-1 at 85-86; Doc. 48-10 ¶ 31.

On October 21, 2013, Plaintiff was issued a letter of instruction by United States Marshal Service Chief Inspector Cathy Jones arising out of an incident on August 3, 2012, when Plaintiff rode in the front seat of the transport vehicle (against procedure) while providing security during the movement of a prisoner named Holli Prather. Doc. 46-Ex I at 43-50. During a courtroom appearance, Prather had become physically upset and Deputy Lowery claimed that she hit him; Plaintiff calmed Prather down and escorted her back to her cell, and subsequently transported her to the facility in Panama City, Florida in a government vehicle with Deputy Kilgore. Doc. 48-10 ¶¶ 23-24. The Deciding Official, Chief Inspector Cathy Jones, reduced the proposed five-day suspension (from Chief Inspector Whitelock) to a letter of instruction based on mitigating factors

which included Assistant Chief Deputy York's statement that he felt Plaintiff's decision to ride in the front seat with the agitated prisoner in back "was a prudent decision." *Id.* at 48-49. The resulting letter of instruction was not placed in Plaintiff's Official Personnel Folder. *Id.*

Plaintiff's internal EEO case proceeded and, on December 17, 2013, Plaintiff requested a hearing before an EEOC administrative judge. Doc. 50, Ex. G, 41. On February 10, 2014, several of the other operational deputies sent a letter to the Marshals Service Headquarters expressing their concerns about Plaintiff trying to intimidate them and their fear for the personal safety in the workplace. Doc. 48-14 at 12-15; Doc. 46-Ex. H at 5; Doc. 46-Ex. K at 432-37. On February 24, 2014, USMS Headquarters assigned Jim Thompson, United States Marshal for the District of Utah, and Mike Claxton, Marshals Service Chief Inspector, to conduct an on-site office assessment of the Northern District of Florida Tallahassee office ("Tallahassee Office Assessment") in response to the ongoing personnel issues in the Tallahassee Office and the letter drafted by Plaintiff's fellow deputies. Doc. 46-Ex. H at 1-12. Neither Thompson nor Claxton has any supervisory authority over Plaintiff, and neither has worked in the Northern District of Florida or Tallahassee Office at any time. Doc. 46-Ex. H at 1-12. The Tallahassee Office Assessment dated April 18, 2014 stated:

> DUSM Gloetzner should not remain in the USMS [Northern District of Florida] Tallahassee office. DUSM Gloetzner, district management and many of the staff express similar conclusions.  The lack of confidence and trust between DUSM Gloetzner, the Deputies and management is damaged beyond repair. The positions of the parties are at such an impasse that the viability of working together is not feasible. . . . DUSM Gloetzner shows significant signs of stress and should be evaluated by a mental competency exam to determine if he is able to fully perform the duties of a DUSM. DUSM Gloetzner indicated he cannot sleep or eat, that his blood pressure is elevated and he had an appointment to see a psychologist at the end of the same week that the assessment was in N/FL. DUSM Gloetzner expressed that he "cannot take any more of this" when referring to managerial retaliation. One manager indicated that DUSM Gloetzner had been in his office on a couple of occasions and that DUSM Gloetzner became emotionally upset and cried while they were discussing different matters. From 1998 through March 2014, DUSM Gloetzner has filed 16 OWCP [workers compensation] claims. Six (6) of these OWCP claims were filed within the past two years. District time and attendance records reflect that in 2013 alone, he used 333 hours of sick leave, 20 hours of OWCP leave and was suspended for 64 hours. To date in 2014 (4 months), he has

used 51 hours of sick leave and 220 hours of OWCP leave. From 2005 through March 2014, DUSM Gloetzner has had eight (8) closed and two (2) active OI-IA investigations. . . . Based on the findings in these OI-IA investigations to date, DUSM Gloetzner has received six (6) suspensions (1-day, 14-day, 3-day, 5-day, 14-day, and 5-day) and two (2) Letters of Instruction. Additionally, immediately prior to the Assessment Team's arrival in [the Northern District of Florida], there were still two (2) active cases pending. The totality of these findings is troublesome and cause for concern.

Doc. 46, Ex. H at 11-12. Plaintiff subsequently underwent a fitness for duty evaluation in Washington D.C. on May 19, 2014 and was placed on administrative leave for approximately three months.[17] Doc. 48-10 ¶ 35.

On June 4, 2014, Plaintiff was issued a letter of caution for conduct unbecoming a deputy marshal after Assistant Chief Deputy York discovered a letter on March 26, 2014 from a federal inmate addressed to Plaintiff which contained inappropriate communication and inferred a *quid pro quo* relationship between the inmate and Plaintiff, in an effort to reduce the inmate's sentence and that of the inmate's incarcerated cousin. Doc. 46-Ex. I at 56-62. Internal Affairs investigated two recorded prison conversations between Plaintiff and the inmate, and there was no evidence that the inmate was a documented informant. *Id*. at 60. Chief Inspector Sligh found a lack of preponderant evidence that Plaintiff violated USMS Policy Directives, but was concerned by the appearance of an inappropriate relationship with the convicted felon and lack of documentation. *Id*. at 61. The letter of caution was not considered a formal disciplinary action and was not placed in Plaintiff's official personnel file. *Id*. at 62.

In Plaintiff's proceedings before the EEOC, on July 1, 2014, following discovery, the Marshals Service filed a motion for summary judgment. Doc. 46-Ex. M at 1. On January 16, 2015, Plaintiff voluntarily withdrew his EEOC Complaint, having filed his civil action in the United

---

[17] Plaintiff's citation to "Doc. **46**-20, pgs. 150-159" and "Ex. 9, 92:6-93:11," to demonstrate he was on administrative leave, are erroneous. Docket Number 46 is Defendant's Motion for Summary Judgment which has lettered exhibits and there is no "Doc. 46-20." Doc. **48**-20 which was filed by Plaintiff, is the deposition of Kerry Phillips, but it does not contain pages 150 to 159. Ex. 9 of Plaintiff's exhibits, Plaintiff's deposition, was replaced by Doc. 50-1, but pages 92 to 93 contain a discussion of the lunch break.

States District Court for the Northern District of Florida two weeks before, on December 29, 2014. Doc. 1; Doc. 46-Ex. G at 1-2. On January 21, 2015, the EEOC issued an Order of Voluntary Dismissal. Doc. 46-Ex. G at 1.

In September 2014, the Marshals Service officially reassigned Plaintiff to the Southern District of New York. Doc. 46-Ex. F at 26-27 (plaintiff's acceptance of the reassignment with "reservation of rights"); Doc. 48-8 at 12-13. Plaintiff was not aware there were actually any openings in the Southern District of New York at the time of his transfer (Doc. 48-10 ¶36); however, the Marshals Service Human Resources Department, who was actively researching openings and imminent potential openings and retirements in the districts across the country had noted openings in the Southern District of New York and District of New Jersey that could accommodate the transfer of Plaintiff's wife (in asset forfeiture). Doc. 46-Exs. D, E. In tandem with Plaintiff's reassignment, the Marshals Service offered to reassign Plaintiff's wife Heather Gloetzner to the District of New Jersey (Newark), with no change in job or grade, but she declined the reassignment. Doc. 46-Ex. F at 28-29; Doc. 48-10 ¶ 37.

No person in the Northern District of Florida had the power to reassign Plaintiff to another district; only managers at the highest level from Marshals Service Headquarters—such as the director or deputy director—could transfer somebody. Doc. 46-Ex. O (Wilson Dep.) at 24.[18] Plaintiff signed a mobility agreement when he was hired by the Marshals Service. Doc. 48-8 at 90-92.

On December 29, 2014, Plaintiff brought suit in this Court under 29 U.S.C. 621, et seq., Age Discrimination in Employment Act (ADEA) and the United States Constitution for age

---

[18] Although Plaintiff argues that Marshal Spooner recommended that Plaintiff be transferred out of the Northern District of Florida, Plaintiff's citation to Doc. 48 at "Ex. 21 at 20:7–21:8" is not his testimony regarding the transfer, but concerns judicial security details. Very few pages of Spooner's testimony were provided and none address Plaintiff's transfer.

discrimination and retaliation[19]. Doc. 1 at 1. Pursuant to the ADEA, Plaintiff alleges he has been treated differently than similarly-situated younger employees on the basis of his age and that he has been subject to a hostile work environment on the basis—"at least in part"—of his age. Doc. 1 at 8 (Count I). Additionally, Plaintiff claimed that Defendant retaliated against him when he opposed and complained about the alleged age-based discrimination. *Id.* at 10 (Count II). Defendant moved for summary judgment on May 18, 2016, Plaintiff responded on July 11, 2016 (after extensions were granted), and Defendant filed a reply on July 20, 2016.  Docs. 46, 53, 54. The matter is ripe for decision.

## II. STANDARD OF REVIEW

Summary judgment is appropriate when the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant must satisfy this initial burden by "identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Norfolk S. Ry. Co. v. Groves*, 586 F.3d 1273, 1277 (11th Cir. 2009) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). In response, "a party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986) (citation and quotation marks omitted). Alternatively, the movant is entitled to summary judgment where "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex*, 477 U.S. at 323. In deciding whether to grant summary judgment, the Court

---

[19]  Plaintiff also alleged constitutional claims, but he subsequently voluntarily dismissed those constitutional claims with prejudice. Doc. 9.

resolves all ambiguities and draws all permissible factual inferences in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Shotz v. City of Plantation, Fla*., 344 F.3d 1161, 1164 (11th Cir. 2003) (citation omitted); *Hairston v. Gainesville Sun Pub. Co*., 9 F.3d 913, 918 (11th Cir. 1993).

### III. ANALYSIS

The ADEA prohibits an employer from discriminating against any employee regarding compensation, terms of employment, or privileges of his job on the basis of age, if the employee is at least 40 years of age. 29 U.S.C. §§ 623(a)(1), 631(a). The ADEA applies to federal workers in most respects. 29 U.S.C. § 633a. However, a federal employee suing under the ADEA is not entitled to a jury trial. *See Lehman v. Nkshian,* 453 U.S. 156, 162 (1981) (although ADEA authorizes a jury trial in civil actions against private employers and state and local governments, Congress did not grant right to jury trial to federal employees suing under the ADEA).

In *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 176 (2009), the Supreme Court held that the language "because of" in the ADEA requires a plaintiff to prove that discrimination was the "but-for" cause of the adverse employment action. *See id.* (explaining that the claim "cannot succeed unless the employee's protected trait actually played a role in [the employer's decision-making] process and had a determinative influence on the outcome") (citing *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610, 113 S.Ct. 1701, 1706, 123 L.Ed.2d 338 (1993)). The burden of persuasion is on the plaintiff to show that "age was the 'but-for' cause of the employer's adverse action." *Gross*, 557 U.S. at 177 (2009).

A plaintiff may establish a prima facie case of age discrimination and retaliation by providing either direct evidence of discriminatory intent by the defendant or by providing circumstantial evidence. *Sims v. MVM, Inc.*, 704 F.3d 1327, 1332 (11th Cir. 2013); *Mora v. Jackson Mem. Found., Inc*., 597 F.3d 1201, 1204 (11th Cir. 2010). Even after the Supreme Court's

decision in *Gross*, the Eleventh Circuit has continued to evaluate ADEA claims based on circumstantial evidence of discrimination using the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Compare Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc) *with Kragor v. Takeda Pharm. Am., Inc.*, 702 F.3d 1304, 1307 (11th Cir. 2012).

Under the *McDonnell Douglas* framework, a plaintiff must first establish a prima facie case of discrimination. *Chapman*, 229 F.3d at 1024. Next, the defendant must articulate a legitimate, non-discriminatory reason for the challenged employment action. *Id.* If the defendant articulates one or more such reasons, the plaintiff is afforded an opportunity to show that the employer's stated reason is a pretext for discrimination. *See Kragor*, 702 F.3d at 1307 (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000); *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. at 1825; *Tex. Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 254–55 (1981). The burden of persuasion always remains on the plaintiff in an ADEA case to proffer evidence sufficient to permit a reasonable fact finder to conclude that the discriminatory animus was the "but-for" cause of the adverse employment action. *See Gross*, 557 U.S. at 173 (holding that it is improper to shift the burden of persuasion to the defendant in an age-discrimination case). If the employer offers a legitimate, non-discriminatory reason, the employee is afforded an opportunity to show that the employer's stated reason is a pretext for discrimination. *Kragor*, 702 F.3d at 1308. Throughout this entire process, the ultimate burden of persuasion remains on the employee. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506–07 (1993).

Assuming for purposes of this motion that a hostile work environment claim is cognizable under the ADEA[20], a plaintiff must show that (1) he belongs to a protected group; (2) he was

---

[20] *See Dexter v. Amedisys Home Health Inc. of Ala.*, 965 F. Supp.2d 1280, 1289 (N.D.Ala. 2013) (holding plaintiff could not show that the elements of a hostile work environment claim had been met, even assuming *arguendo* such a claim was cognizable under the ADEA) (citing *EEOC v. Massey Yardley Chrysler Plymouth, Inc.*, 117 F.3d 1244, 1249 n. 7 (11th Cir. 1997); *Mosley-Coleman v. Potter*, 2009 WL 1811552, at 2 (S.D. Ga. June 24,

subjected to unwelcome harassment; (3) the harassment was based on a protected characteristic of the employee; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) the employer is responsible for such environment under either a theory of vicarious or of direct liability. *Clark v. S. Broward Hosp. Dist.*, 601 F. App'x 886, 898-99 (11th Cir. 2015)[21]. With regard to the element of causation, a plaintiff must show that the protected activity (*e.g.* filing an EEO action) was the but-for cause of the discriminatory or retaliatory hostile work environment. *Clark*, 601 F. App'x at 899; *Simms v. MVM, Inc.*, 704 F.3d 1327, 1334 (but-for causation required for age discrimination claims).

The requirement that the harassment be "severe or pervasive" contains an objective and a subjective component, and the behavior must result in both an environment that a reasonable person would find hostile or abusive and an environment that the victim subjectively perceived to be abusive. *Miller v. Kenworth of Dothan, Inc*., 277 F.3d 1269, 1275 (11th Cir. 2002). To establish this, a plaintiff must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Rojas v. Florida*, 285 F.3d 1339, 1344 (11th Cir. 2002) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). "To evaluate the objective severity of an allegedly retaliatory hostile work environment, we consider the totality of the circumstances, including whether the conduct was frequent, severe, physically threatening, humiliating, merely an offensive utterance, and whether it unreasonably interfered with the employee's job performance." *Gowski v. Peake*, 682 F.3d 1299, 1312–13 (11th Cir. 2012). But

---

2009) ("Although the Eleventh Circuit has not specifically decided whether hostile work environment claims are actionable under the ADEA, it has implicitly recognized the viability of such claims and has analyzed them under the Title VII framework.").

[21] Unpublished opinions of the Eleventh Circuit constitute persuasive and not binding authority. *See* 11th Cir. R. 36-2.

discrete acts, such as termination or the failure to promote, cannot alone form the basis of a hostile-work-environment claim. *See McCann v. Tillman*, 526 F.3d 1370, 1378 (11th Cir. 2008) (noting that a hostile-work-environment claim addresses the cumulative nature of the conduct and not the specific discrete act).

### 1. Timeliness of claims

As an initial matter, Defendant contends that the Court should dismiss Plaintiff's claims to the extent they are based on alleged events that occurred on or before Wednesday May 16, 2012–which is more than 45 days prior to Plaintiff's initiation of his EEO contact on Friday, June 29, 2012. Doc. 46-Ex. A at 37. These events include incidents with a fellow Deputy Marty West and Chief Deputy Nerney, which occurred in August and October 2011, and a suspension in February 2012 by Marshal Spooner effective March 26 through March 28, 2012.[22] Plaintiff also contends that certain supervisors made threats against him in 2012 *before* Plaintiff's June 29, 2012 complaint. Doc. 1 ¶ 17.

"Under . . . the ADEA, federal employees are required to initiate administrative review of any alleged discriminatory or retaliatory conduct with the appropriate agency within 45 days of the alleged discriminatory act." *Smithers v. Wynne*, 319 F. App'x 755, 756-57 (11th Cir. 2008) (citing 29 U.S.C. § 633a(b); 42 U.S.C. § 2000e–16(b); 29 C.F.R. § 1614.105(a)(1)). "[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. . . . The clock for the charging period starts when the discrete unlawful practice takes place." *Smithers*, 319 F. App'x at 756-57 (citation omitted).

Plaintiff apparently concedes that the incidents which took place prior to May 16, 2012 are not actionable in a disparate treatment claim[23]:

---

[22] Plaintiff's allegation regarding the March 2012 suspension (three months prior to his EEO complaint) was dismissed by the USMS EEO Office as untimely.   Doc. 46-Ex. A at 79.

[23] Plaintiff argues some of the pre-June 2012 conduct may be considered as part of a hostile work

> Ultimately, while Plaintiff disagreed with the discipline imposed as part of the incident with Mr. West, and while that treatment is undoubtedly indicative of a hostile and retaliatory work environment, the disparate actions that affected Plaintiff financially and in terms of performance and promotion *began with his non-selection in June 2012* and being told that he was not allowed to participate in promotional opportunities because he was too old.

Doc. 53 at 11-12. Accordingly, Plaintiff's allegations of age-based disparate treatment are thus limited to a *single* incident: being passed over or "non-selected" for firearms and fitness training on June 19, 2012 based on his age.

### 2. *Hostile Work Environment (Age-Based)*

As to Plaintiff's claims of hostile work environment based on age, he alleges in Count I: he "has been subject to hostility and poor treatment on the basis, *at least in part*, of his age." Doc.1 at 9 (emphasis added). A plaintiff is required to show that the harassment was based on his membership in the protected group, in this case age, and it was "severe or pervasive enough to alter the terms and conditions of employment and create a hostile or abusive working environment." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012) ("Only conduct that is 'based on' a protected category, such as [age], may be considered in a hostile work environment analysis."). "Innocuous statements or conduct, or boorish ones that do not relate to the [age] of the actor or of the offended party (the plaintiff), are not counted." *Jones*, 683 F.3d at 1292 (citation omitted).

Defendant argues that Plaintiff has failed to state a claim for age-based discriminatory hostile work environment because he has not offered any evidence of a but-for causal connection between the alleged harassment and his age. Plaintiff alleges a solitary act of *age*-based discrimination–that he was not selected for firearms and fitness trainings in June 2012. Plaintiff testified that he suffered no age discrimination of any kind prior to June 19, 2012. Doc. 46-Ex. P

---

environment claim. Doc. 53 at 11-12. The Court addresses the hostile work environment claim separately *infra*.

at 21. Defendant also argues the fact that Plaintiff is younger than Marshal Spooner, Chief Deputy Nerney, and Assistant Chief Deputy York is additional evidence that the Tallahassee Office was not an environment that was "hostile" to employees of Plaintiff's age (over 40).

Plaintiff fails to respond to Defendant's points regarding the incongruity of showing a "severe and pervasive" hostile environment, when there is but a single incident of age-based discrimination alleged. *See, e.g., Mosley-Coleman v. Potter*, No. CV-309-033, 2009 WL 1811552 (S.D. Ga. June 24, 2009) (holding a single isolated incident of yelling and criticism insufficient as it was not "so severe or pervasive so as to create a discriminatory, abusive working environment"); *Crawford v. Medina General Hosp.*, 96 F.3d 830, 836 (6th Cir. 1996) (holding two remarks about "women over 55 working" and "old people" by supervisor were offensive utterances insufficient to constitute a pervasive environment based on age as opposed to "a simple clash of personalities"); *cf. Kassner v. 2nd Avenue Deli., Inc*., 496 F.3d 229 (2d Cir. 2007) (holding that 79-year-old waitress stated a claim for ADEA hostile work environment against restaurant owner who repeatedly made degrading comments including "drop dead," "retire early," "take off all of that make-up," and "take off your wig").

Plaintiff's response (Doc. 53) is limited to *retaliation*-based hostile environment that he argues existed in "the wake of Plaintiff's EEO complaint." Doc. 53 at 16. Plaintiff has failed to make out a discriminatory hostile work environment claim based on his *age*, and summary judgment is warranted on any such claim. The Court addresses separately below the allegations of retaliation-based hostile work environment.

### 3. *Disparate Treatment Age-Based Discrimination*

#### A.  *Direct Evidence of Discrimination*

Plaintiff alleges that Supervisory Deputy Wilson's statement that he was sending a newer, younger deputy to the firearms instructor training is direct evidence of age discrimination. Direct

evidence of discrimination reflects a "discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee" which "if believed, proves [the] existence of [a] fact without inference or presumption." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004) (citations and internal quotation marks omitted). "[O]nly the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence of discrimination. If the alleged statement suggests, but does not prove, a discriminatory motive, then it is circumstantial evidence." *Id.*; *Castle v. Sangamo Weston, Inc,* 837 F.2d 1550, 1558 n.13 (11th Cir. 1988) (giving as an example of direct evidence of age discrimination, a scrap of paper reading, "Fire Rollins-she is too old"); *cf. Kilpatrick v. Tyson Foods, Inc.,* 268 F. App'x 860 (11th Cir. 2008) (holding email from manager that said he "do[es] understand [Kilpatrick's] years of service with the company but at this point [Kilpatrick] is not effectively doing his position" was not direct evidence of discrimination); *Damon v. Fleming Supermarkets of Fla., Inc*., 196 F.3d 1354, 1359 (11th Cir. 1999) (decision-maker's comment that "the company needed . . . young men . . . to be promoted" did not constitute direct evidence of age discrimination).

A plaintiff can only rely on remarks as direct evidence of discrimination if they were uttered by the decision-maker in the challenged action himself, or, at the very least, by a person somehow involved in, or having an influence on, the decisional process.[24] *See Cardelle v. Miami Beach Fraternal Order of Police*, 593 F. App'x 898, 901 (11th Cir. 2014) (threats of job loss, age-based slurs, and statement that older employees should "move on" made by non-decision-makers could not suffice as direct evidence of age discrimination); *Mitchell v. USBI Co.*, 186 F.3d 1352, 1355 (11th Cir. 1999) (holding that statements by non-decisionmakers do not raise an inference of

---

[24] A decisionmaker is a person with the authority to hire and fire employees, not a co-employee. *See Standard v. A.B.E.L. Servs., Inc*., 161 F.3d 1318, 1329 (11th Cir. 1998); *Evans v. McClain of Ga., Inc*., 131 F.3d 957, 962 (11th Cir. 1997).

discrimination); *Holifield v. Reno*, 115 F.3d 1555, 1563-64 (11th Cir. 1997) ("The biases of one who neither makes nor influences the challenged personnel decision are not probative in an employment discrimination case.").

Plaintiff contends that his supervisor, Supervisory Deputy Wilson, said he did not choose Plaintiff for the firearms training[25] because he "wanted to send a younger deputy" who would "be around for the next twenty years." Doc. 53. Plaintiff argues that this statement is direct evidence of intentional discrimination against him on the basis of age, and such direct evidence dispenses with the need to evaluate a prima facie case of discrimination.

However, "[b]ecause age and years of service are analytically distinct, an employer can take account of one while ignoring the other, and thus it is incorrect to say that a decision based on years of service is necessarily 'age based.'" *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 611 (1993). In *Dilla v. West*, the trial court found the hiring decision-maker's statement that he would prefer to hire a 30- to 35-year-old for the disputed air traffic controller position supported "a reasonable inference that the plaintiffs' ages—and associated stereotypical thinking regarding older employees, namely that they are more likely to retire in the near future—influenced the decision to select a younger man for the vacancy," but was not *direct* evidence of age discrimination. 4 F. Supp. 2d 1130, 1139 (M.D.Ala. 1998), *aff'd,* 179 F.3d 1348 (11th Cir. 1999) ("Reliance on factors correlated with age does not by itself constitute age discrimination but purported reliance on such factors may be a pretext for discrimination.").   The court explained:

> [T]he fact that such a conclusion depended upon the drawing of inferences from [decisionmaker's] statement undermined any attempt to characterize the statement as direct evidence, especially when viewed in the context of a conversation about the potential imminent retirement of a large percentage of [his] workforce, the statement was susceptible to differing interpretations: [He] may have been expressing his desire to offer the position to younger candidates because they would

---

[25] Plaintiff alleges only circumstantial evidence in support of his ADEA claim based on his non-selection for the fitness training.

> be [less[26]] likely to retire quickly and thus potentially leave him short-staffed at an inconvenient time, or he may merely have been expressing his desire to hire someone with less civil service experience who would be statutorily-ineligible to retire for a long period of time, and who would therefore offer the high degree of 'continuity' he sought in a candidate. Because it finds that the statement is subject to either of these interpretations, the latter of which is untainted by unlawful age bias, the court cannot conclude that the statement constitutes direct evidence of age discrimination.

*Id*. As Judge Thompson observed, "consideration of a job candidate's retirement eligibility is permissible and does not constitute unlawful age discrimination unless accompanied by a reliance upon inaccurate and denigrating age-based stereotypes." *Id.*at 1139 n.10 (citing *Hazen Paper*, 507 U.S. 604). Similarly, in this case, Supervisory Deputy Wilson said he chose Deputy Lowery, who had one year of experience, instead of Plaintiff for the firearms training because he wanted to send a younger deputy who would be "around for the next twenty years," which he deemed a more "cost-effective decision"; York sent Deputy Phillips, also a less experienced deputy, to the fitness training based on Wilson's recommendation that it would be better to send the "newer, younger deputies."

Supervisory Deputy Wilson may have been expressing, as explained in *Dilla*, a "desire to send a person who would be statutorily-ineligible to retire for a long period of time." *See Hazen Paper*, 507 U.S. at 611 (holding a decision based on years of service is not necessarily "age based" or violates the ADEA because age and years of service are analytically distinct). Under either interpretation, the Court is required to draw an inference. Accordingly, the statement is circumstantial evidence and not direct evidence; thus, the Court will use the burden-shifting framework from *McDonnell Douglas* to assess the circumstantial evidence. Moreover, Plaintiff devotes the majority of his discussion to an analysis of circumstantial evidence of discrimination and mentions "direct" evidence only in passing and without citation to any relevant authority. Doc.

---

[26] The original decision contained a scrivener's error; it was corrected and the word "less" added to the original decision in *Dilla v. West*, 31 F.Supp.2d 1347 (M.D.Ala. 1999).

53 at 15.

### B. Circumstantial Evidence

As explained above, to evaluate ADEA claims based on circumstantial evidence, the Eleventh Circuit employs the *McDonnell Douglas-Burdine* framework. *See Kragor v. Takeda Pharms. Am., Inc.*, 702 F.3d 1304, 1308 (11th Cir. 2012) (applying *McDonnell Douglas* framework to an ADEA claim). In the *McDonnell Douglas* analysis, the plaintiff first must establish a prima facie case of age discrimination by showing that the plaintiff was "(1) a member of a protected age class (over 40), (2) was qualified for the job or benefit at issue, (3) was subjected to an adverse employment action, and (4) was treated less favorably than similarly-situated employees who are not members of the protected class. *Chapman*, 229 F.3d at 1024.

Defendant concedes that Plaintiff established two of the four elements of the *McDonnell Douglas* framework. Plaintiff is a member of a protected class based on his age, forty-five years old at the time he was denied the training; and he was qualified to attend the firearms training and the fitness training. *See* Doc. 53 at 5. The two elements that Defendant does contest are whether Plaintiff was subjected to an adverse employment action when he was not selected to attend the trainings and whether he was treated less favorably than similarly-situated younger employees. *Id.*

### 1) Adverse employment action

Defendant first contends that summary judgment is warranted on Plaintiff's claims of disparate treatment, *i.e.*, his non-selection for firearms and fitness training, because he has failed to allege an "adverse action" based on age discrimination. Plaintiff contends that he can show he was subject to an adverse action when he was denied the opportunity to participate in the firearms training and fitness training because it had a measurable impact on his career.

The parties both rely on *Davis v. Town of Lake Park, Florida*, as defining an "adverse employment action" for purposes of employment discrimination claims as a "serious and material

change in the terms, conditions, or privileges of employment;" the "employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances." 245 F.3d 1232, 1239 (11th Cir. 2001) ("to support a claim . . . the employer's action must impact the terms, conditions, or privileges of the plaintiff's job in a real and demonstrable way."). "[N]ot all conduct by an employer negatively affecting an employee constitutes adverse employment action." *Id.* "[T]he asserted impact cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment." *Id.* An employee bears the burden of showing "a serious and material change in the terms, conditions, or privileges of employment." *Id.*

Defendant argues that Plaintiff has not alleged any concrete facts showing that Defendant's selection of Deputy Lowery for firearms training in the summer of 2012 resulted in any objective tangible harm in a term, condition, or privilege of Plaintiff's employment and Plaintiff did not suffer any decrease in work hours, salary, or other tangible benefits. Plaintiff argues that denial of the opportunity to complete the two trainings had a "measurable impact" on Plaintiff's career and these trainings were not merely opportunities to gain additional knowledge or skills, but resulted in actual, tangible job duties once completed. Doc. 53 at 13. As a result of his selection for firearms instructor school, Plaintiff argues that Deputy Lowery became the firearms instructor in Tallahassee and was able to offer training and examinations to fellow deputies. Similarly, as a result of his selection for fitness school, Deputy Phillips was able to offer fitness evaluations to other deputies.

The Court finds that Defendant's nonselection of Plaintiff for the firearms and fitness trainings were not "adverse employment actions" for purposes of the ADEA. The Eleventh Circuit has cautioned that "applying the adverse action requirement carefully is especially important when the plaintiff's claim is predicated on his disagreement with his employer's reassignment of job

tasks." *Davis*, 245 F.3d at 1244 ("[w]ork assignment claims strike at the very heart of an employer's business judgment and expertise because they challenge an employer's ability to allocate its assets in response to shifting and competing market priorities"). When a change in assignments or duties is not accompanied by any tangible harm, courts are reluctant to hold that the change amounts to an adverse employment action. *Id.* at 1244-45 (citing *Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549, 1557 (D.C. Cir. 1997) ("agreeing with other circuits [which] have held that changes in assignments or work-related duties do not ordinarily constitute adverse employment decisions if unaccompanied by a decrease in salary or work hour changes")). Defendant's nonselection of Plaintiff for the two trainings did not impact his job title, salary, or benefits in any way. Plaintiff has failed to establish that Defendant's denial of training had any tangible harm or impact on his employment. *See Davis*, 245 F.3d at 1244-45 (Title VII is not designed to make federal courts "sit as a super personnel department that reexamines an entity's business decisions"); *see also Higdon v. Jackson*, 393 F.3d 1211, 1219 (11th Cir. 2004) ("an employment action . . . is not adverse merely because the employee dislikes or disagrees with it and not everything that makes an employee unhappy is an actionable adverse action").

Under the ADEA, "the denial of professional training opportunities may constitute an adverse employment action, but only where an employee can show 'material harm' from the denial, 'such as a failure to promote or a loss of career advancement opportunities.'" *Trachtenberg v. Department of Educ. of City of New York*, 937 F. Supp. 2d 460, 468 (S.D.N.Y. 2013) (holding teacher failed to show an adverse employment action because she had not shown any negative consequences resulting from the alleged denial of professional training); *cf. Colon–Fontánez v. Municipality of San Juan*, 671 F. Supp. 2d 300, 333 (D.P.R. 2009) (noting that even if the employer had intentionally prevented the employee's participation in a training workshop such conduct

would not constitute an adverse employment action under Title VII); *aff'd*, 660 F.3d 17 (1st Cir. 2011).

In this case, Plaintiff has not provided any evidence that his non-selection for the two trainings led to a decrease in his salary, changes in his work hours, or other material harm. *Davis*, 245 F.3d at 124-45 (rejecting as "adverse employment actions" a police officer's loss of "officer in charge" designations which he argued diminished his prestige and deprived him of experience which might make him more likely to obtain (as yet unsought) promotions in the future). In *Summers v. Winter*, the Eleventh Circuit rejected a police officer's contention that his required *participation* in a new training program—five days long and occurring once per year—constituted "a serious and material change in the terms, conditions, or privileges of employment" such that it was an adverse employment action. 303 F. App'x 716, 719 (11th Cir. 2008).

In a *denial* of training case similar to Plaintiff's situation, the district court in *Casey v. Mabus* held that the denial of a police instructor certification training did not constitute an adverse employment action. 878 F. Supp. 2d 175, 184 (D.D.C. 2012). Although the police officer speculated that the training would have enabled her to more fully carry out her duties and increase her potential for career advancement, the denial of her participation in planning and teaching the training courses did not rise to the level of an adverse action "absent some concrete factual allegation that her training deficit imposed a tangible harm on the terms, conditions, or privileges of her employment." *Casey*, 878 F. Supp. 2d at 184.

Here, Plaintiff contends that the two trainings "served a very tangible purpose, and provided skills valued by supervising employees far above any run-of-the-mill lecture. Essentially attending and completing these trainings guaranteed additional job responsibilities and duties," such as giving fitness evaluations or firearms training and examinations. Doc. 53 at 13. In this case, Plaintiff fails to demonstrate how the lack of firearm or fitness training resulted in material

harm to him in the terms, conditions, or privileges of his employment, aside from a theoretical argument that he would be "guaranteed additional job responsibilities and duties." Such an argument does not explain the tangible harm to the terms, conditions, or privileges of his employment. *See Casey*, 878 F. Supp. 2d at 184 ("Although it is logical in the abstract to think that more training results in higher quality work and better career opportunities, the plaintiff alleges no facts to demonstrate how these added trainings would have materially affected her employment."). Defendant is entitled to summary judgment on Plaintiff's disparate treatment age-based claim because he has failed to show that the denial of training was "an adverse employment action."

### 2) Lack of comparators

Defendant alternatively contends that Plaintiff cannot make out a prima facie case of age discrimination because he has not identified a similarly-situated comparator who was treated more favorably. Generally, the employee who a plaintiff identifies as a comparator must be "similarly-situated" in all relevant respects. *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004); *Trask v. Secratary Dept. of Veterans Affairs*, 822 F.3d 1179 (11th Cir. 2016)[27]. The comparator must be "nearly identical" to the plaintiff to prevent a court from second-guessing a reasonable decision by the employer. *Id.* Thus, in order for Plaintiff in this case to establish a prima facie case for unlawful disparate treatment, he must show that a similarly-situated individual outside of his protected class was selected to attend the firearms and fitness trainings for which Plaintiff was not selected. *See Maynard v. Bd. of Regents*, 342 F.3d 1281, 1289 (11th Cir. 2003).

Defendant contends that Plaintiff has not demonstrated that he was similarly-situated in comparison to Deputies Lowery and Phillips, each of whom was a newer deputy with fewer collateral duties than Plaintiff; as a deputy in the Tallahassee Office since 2003 (and several years of additional experience in another office), he had more collateral duties than the newer deputies

---

[27]  A petition for certiorari was filed on October 17, 2016 (No. 16-513).

who had only been in the Tallahassee office for approximately one year as of 2012. Deputy Lowery, at the time of the firearms training, had been employed by the Marshals Service for approximately one year. Doc. 46-Ex. N at 6-7. In the summer of 2012, Deputy Lowery's only two collateral duties were Motor Vehicles and "Less than Lethal Instructor," and Deputy Phillips had a single collateral duty as "Property Management." Doc. 46-Ex. M at 33-35; Doc. 46-Ex. N at 6-7. In contrast, at the time of the firearms training in the summer of 2012, Plaintiff had been a deputy for 20 years and was assigned to five collateral duties: (a) Sex Offender Investigations Coordinator; (b) Less than Lethal Instructor; (c) Protective Investigations Coordinator; (d) Community Detention Officer; and (e) Seized Assets Coordinator. Doc. 46-Ex. M at 33-35. Plaintiff does not dispute the disparity in the collateral duties between Plaintiff and the newer deputies, but argues they were all considered "deputy marshals" and thus "expected to perform the same range of tasks as well as collateral duties" which would make them sufficiently "nearly identical" to serve as comparators for purposes of the ADEA.

Courts do make a distinction in assessing comparators between supervisors in positions with greater responsibilities and lower level employees, finding the two positions are not similarly-situated. *See, e.g., Vasquez v. Cty. of Los Angeles*, 349 F.3d 634, 641 & n.16 (9th Cir. 2003), *as amended* (Jan. 2, 2004) (employees in supervisory positions are generally deemed not to be similarly-situated to lower level employees); *Jones v. Denver Post Corp.*, 203 F.3d 748, 753 (10th Cir. 2000) (finding employee and his supervisor were not similarly-situated for purposes of race discrimination claim). On the other hand, "individuals are similarly-situated when they have similar jobs and display similar conduct." *Vasquez*, 349 F.3d at 641. In *Brillinger v. City of Lake Worth*, an ADEA disparate treatment-discipline case brought by a sergeant with eighteen years experience, the Eleventh Circuit held that less-experienced police officers with fewer years on the

force and lower rank, as well as limited instances of prior discipline relative to the plaintiff, were not appropriate comparators. 317 F. App'x 871, 876 (11th Cir. 2008).

Defendant also contends that Plaintiff was not similarly-situated in that he was previously scheduled to, and did, attend a week-long sex offender training in Washington, D.C. from June 25-29, 2012, as the only representative from the Tallahassee Office (Doc. 46, Ex. A at 360) and he was thus not in a position to attend a second out-of-town firearms training two weeks later, from July 16 through July 27, 2012, in Glynco, Georgia[28]. Doc. 46, Ex. L at 3-6. Plaintiff was also on annual leave from July 23 and July 27, 2012, and under investigation by Internal Affairs from July 5, 2012 through July 30, 2012. Ex. C, 60.[29] The Internal Affairs investigation involved a credit card used for gas purchases that Plaintiff "accidentally cut up." Doc. 48-12 at 63-66. At the time, Plaintiff was also on a stress-related work restriction, and according to Plaintiff, the "USMS Medical Division did not want [him] placed in any unintentionally stressful situations." *See* Doc. 48-12 at 65; Doc. 48-10 ¶ 8.

Plaintiff does not directly respond to Defendant's factual arguments, but instead cites an inapposite footnote in *McCann v. Tillman*, 526 F.3d 1370, 1374 n.4 (11th Cir. 2008), as stating that "'nearly identical,' does not mean 'exactly identical' and 'a range of comparators may suffice.'" Doc. 53 at 13. The *McCann* footnote does not really help Plaintiff in that the panel rejected the plaintiff-police officer's argument that "similar" conduct was sufficient and held that it was bound by precedent to adhere to the more stringent "nearly identical" standard, which Plaintiff has not shown. *McCann*, 526 F.3d at 1374 n.4.

---

[28]  Neither party states when Plaintiff would have attended the fitness training.

[29]  To the extent Defendant argues that "[d]uring the relevant times, Plaintiff was selected for a number [of] trainings and detail assignments, although in some instances Plaintiff was restricted by [Marshals Service] Headquarters due to Plaintiff's medical issues and ongoing USMS Internal Affairs investigations," some of the trainings were actually after the relevant time period at issue in July 2012.

Even when the evidence is viewed in the light most favorable to Plaintiff, the Court does not find that Deputies Lowery and Phillips, each with only a year of experience and significantly more limited collateral duties, were similarly-situated comparators, given Plaintiff's work restrictions during the time he sought to attend the training. Particularly in light of the fact that Plaintiff was under investigation by Internal Affairs during the time from July 5, 2012 through July 30, 2012—overlapping with the two-week firearm training (July 16 to 27, 2012) as well as being under a "stress-related" medical restriction from Headquarters—also renders these newer deputies as not similarly-situated and not "comparators." Because Plaintiff did not demonstrate that a similarly-situated comparator outside of his protected class was allowed to attend training during an on-going investigation or medical restriction, he has failed to establish a prima facie case under the *McDonnell Douglas* framework for unlawful disparate treatment. *See Trask*, 822 F.3d at 1192-93; *Maynard*, 342 F.3d at 1289.

Plaintiff argues that a plaintiff nonetheless can survive a summary judgment motion in an employment discrimination case, despite the failure to produce an appropriate comparator under the *McDonnell Douglas* framework, if he presents circumstantial evidence which creates a triable issue when, "viewed in a light most favorable to the plaintiff, [he] presents 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." Doc. 53 at 14 (citing *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011) and similar cases). Despite the lack of a suitable comparator, the Court will address below Plaintiff's circumstantial evidence of age discrimination, and finds it does not present "a convincing mosaic" of circumstantial evidence that, when viewed in a light most favorable to him, would allow a jury to infer intentional discrimination.

   *3)  Pretext*

Even though Plaintiff did not meet his burden of making a prima facie case for the age-based discrimination in his non-selection for trainings, the Court finds it prudent to discuss Defendant's non-discriminatory reasons for the decision. Plaintiff bases his disparate treatment claim on Supervisory Deputy Wilson's statements directly to Plaintiff, and as a recommendation to York, that he wanted to send the two younger deputies to the trainings because they were "newer deputies" who would be "around for the next twenty years" and he was making a "cost-effective decision."

Defendant contends there was no implication in anything advanced by Plaintiff that he was found unsuitable for either training because of his age or because of any concern or assumption about age-related decreased abilities. Supervisory Deputy Wilson's decision (and Assistant Chief Deputy York's decision made on Wilson's recommendation) was based on the fact that the candidates selected would be "around" or remain working as deputy marshals to fulfill the role of instructors in the Tallahassee Office for a longer period of time than the Plaintiff.[30] Doc. 54 at 4. Defendant argues that summary judgment is appropriate because despite Plaintiff's depositions of each person employed in the Tallahassee Office and the Marshals Service's production of thousands of pages of documents, the record contains no concrete evidence demonstrating that Defendant's proffered reasons were pretext, and Plaintiff cannot show that age was the but-for cause of Defendant's decision to select the other deputies for the training.

The only evidence that Plaintiff offers of pretext concerning age-based discrimination (as opposed to retaliation, discussed below) is "Mr. Wilson himself stated that his actions in June 2012 were based on Plaintiff's age." Although Plaintiff argues in his Response that Wilson failed to select him because he was simply "too old."[31] (Doc. 53 at 20), Plaintiff's own deposition testimony

---

[30] It is undisputed that Plaintiff would be subject to mandatory retirement at age 57. Doc. 46-Ex. I at 56.

[31] Defendant correctly argues that Plaintiff's belated and unsupported allegation that Supervisory Deputy Wilson simply said Plaintiff was "too old," without elaboration, is contradicted by Plaintiff's own deposition testimony that Wilson told Plaintiff that he wanted to send a newer, younger deputy "who would be around for the

was that Supervisory Deputy Wilson told him that he was sending Deputy Lowery instead of Plaintiff because: "You're not going to be around for the next twenty years and Josh [Lowery] is. . . . [I]t's a cost-effective decision." Doc. 50-1 at 33; *see also* Doc. 48-10 at ¶ 9 ("Mr. Wilson told me that he could not send me to firearms instructor school, despite my repeated requests to attend, because he wanted to send a younger deputy who would "be around for the next twenty years, unlike me, who was older.") Treating employees differently based on their *years of service* with the employer is permissible and not a violation of the ADEA. *See Hazen Paper v. Biggs*, 507 U.S. 604, 611 (1993) (holding that a finding of intentional discrimination could not be based solely on the employer's reliance on a factor correlated with age); *Dilla v. West,* 4 F. Supp. 2d 1130, 1141 (M.D. Ala. 1998) (holding decision to hire younger candidate would have been made upon consideration of his statutorily-defined retirement eligibility from their applications, in light of the potential widespread retirement of air traffic controllers), *aff'd* 179 F.3d 1348 (11th Cir. 1999); *Kentucky Ret. Sys. v. EEOC*, 554 U.S. 135, 143-48 (2008) (holding that the correlation of age with pension status did not, by itself, support an inference of age discrimination and to state an ADEA disparate-treatment claim a plaintiff must show that the differential treatment was "actually motivated" by age, not pension status); *see also Anderson v. Baxter Healthcare Corp*., 13 F.3d 1120, 1125–26 (7th Cir. 1994) (holding that terminating an employee to reduce salary costs is not age discrimination; although compensation level is often correlated with age, it is analytically distinct, and is not necessarily "age-based"); *Cramer v. McDonnell Douglas Corp*., 120 F.3d 874, 876 n.5 (8th Cir. 1997) ("[D]ischarging an employee solely because of his status as a higher paid employee, does not alone permit an inference of age discrimination.").

---

next twenty years. . . . [I]t's a cost-effective decision." Doc. 50-1 at 33; Doc. 48-10 ¶ 9. *See McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1240 (11th Cir. 2003) ("Under the law of this Circuit, we may disregard an affidavit submitted solely for the purpose of opposing a motion for summary judgment when that affidavit is directly contradicted by deposition testimony."); *Van T. Junkins & Assocs. v. U.S. Industries*, 736 F.2d 656, 657 (11th Cir. 1984) (A party "cannot . . . create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony.").

Defendant has asserted a legitimate non-discriminatory reason for selection of the younger deputies, *i.e.*, fewer years of deputy marshal service, fewer collateral duties, and significantly less specialized training than Plaintiff at that time. Moreover, Plaintiff was already scheduled, just prior to the firearms training, to attend a week-long sex offender training in Washington, D.C., and at the exact same time as the training, was scheduled to take personal leave and was under an Internal Affairs investigation. Doc. 46-Ex. A at 240; Doc. 46-Ex. M at 33.

Because Defendant has offered a legitimate nondiscriminatory reason for selecting the newer deputies over Plaintiff for the trainings, the burden shifts to Plaintiff to demonstrate that Defendant's reason are pretextual. To show pretext, Plaintiff must "demonstrate that the proffered reason was not the true reason for the employment decision. . . [Plaintiff] may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981); *see Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1088 (11th Cir. 2004); *see also Crawford v. City of Fairburn, Ga.*, 482 F.3d 1305, 1308 (11th Cir. 2007) (to show pretext, "[t]he plaintiff must meet the reason proffered head on and rebut it"). Plaintiff must produce "concrete evidence in the form of specific facts which show that the defendant's proffered reason is mere pretext." *Bryant v. Jones*, 575 F.3d 1281, 1308 (11th Cir. 2009) (quotation omitted). In this case, Plaintiff has failed to produce any evidence that would permit a reasonable factfinder to determine that the reasons he was not selected for the firearms and fitness training were pretextual.

The Court's role in employment decisions is very limited:

> Federal courts "do not sit as a super-personnel department that reexamines an entity's business decisions. No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, the ADEA does not interfere. Rather our inquiry is limited to whether the employer gave an honest explanation of its behavior.

*Chapman*, 229 F.3d at 1030 (quoting *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir.1991)).

### 4.  *Retaliation & Retaliatory Hostile Work Environment*

Plaintiff alleges that he was retaliated against in violation of the ADEA when he was subject to discipline and subsequently reassigned to another district. Doc. 1 at 10 (Count II). Section 633a(a) of the ADEA which prohibits discrimination against a federal employee based on age also prohibits retaliation against an employee who complains of age discrimination. *See Gomez-Perez v. Potter*, 553 U.S. 474, 491 (2008). To successfully allege a prima facie retaliation claim under the ADEA, a plaintiff must show that (1) he engaged in statutorily protected expression; (2) he suffered an adverse employment action; and (3) the adverse action was causally related to the protected expression. *Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1311 (11th Cir. 2002). "The same burden shifting framework that governs ADEA discrimination claims governs claims for ADEA retaliation." *Maust v. United Parcel Serv. Gen. Servs. Co.*, 897 F. Supp. 2d 1351, 1362-63 (N.D. Ga. 2012). The third element, a causal relationship, requires an employee to demonstrate that the decision-maker was aware of his protected conduct and that the protected conduct and the adverse action were not wholly unrelated. *McCann v. Tillman*, 526 F.3d 1370, 1376 (11th Cir. 2008).

"Only after the plaintiff makes this prima facie case of discriminatory retaliation does the burden shift to the defendant to rebut the presumption of retaliation by producing legitimate reasons for the adverse employment action." *Maust*, 897 F. Supp. 2d at 1362-63. "The employer's burden [to provide a legitimate non-discriminatory reasons] is 'exceedingly light.'" *Kennedy v. Kelly Temp. Servs., Inc.*, 95 F. Supp. 2d 1288, 1292 (M.D. Ala. 2000) (quoting *Meeks v. Computer Associates Intern.*, 15 F.3d 1013, 1021 (11th Cir. 1994)). "If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted and drops from the case."

*Maust*, 897 F.Supp. at 1362-63. "To survive summary judgment, the plaintiff must then produce sufficient evidence from which a reasonable trier of fact could find the defendant's proffered nondiscriminatory reason to be pretextual." *Id*.

   A. *But-for causation*

   The parties disagree as to whether, as in an age discrimination disparate treatment claim, a plaintiff must show but-for causation to survive summary judgment on a retaliation claim. Defendant cites the Supreme Court's decision in *University of Texas Southwestern Medical Center v. Nassar*, as requiring that "retaliation claims must be proved according to traditional principles of but-for causation . . . This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." 570 U.S. __, 133 S.Ct. 2517, 2533 (2013) (Title VII case). Doc. 54 at 8.

   Plaintiff contends that but-for causation as required in *Nassar* does not apply to his case because that Supreme Court decision concerned the level of proof required to "prove" retaliation at trial (on a jury verdict) and not "the burden of persuasion necessary to defeat summary judgment." Doc. 53 at 15 (citing *Nassar,* 133 S.Ct. at 2524-25, 2534 and *Ramirez v. Bausch & Lomb, Inc.*, 546 Fed. App'x 829, 833 (11th Cir. 2013)[32]). Defendant responds that Plaintiff must show that retaliation was the but-for cause of the hostile work environment in order to withstand a motion for summary judgment. Doc. 54 at 8. Defendant argues that, as in *Clark v. South Broward Hospital District*, 601 F. App'x 886, 899 (11th Cir. 2015), which relies on *Nassar*, the summary judgment posture is the same as in this case–and the court found that the plaintiff had failed to prove the but-for causation required to establish a prima facie case. In *Clark*, the Eleventh Circuit

---

   [32]  Even in the Eleventh Circuit's *Ramirez* decision cited by Plaintiff, which was decided just three months after *Nassar,* the panel noted in a footnote that the Supreme Court "did not clarify the role of 'but-for' causation in a plaintiff's prima facie case" but the panel left the door open to having it apply, stating "the district court [on remand] may need to consider whether [plaintiff] has sufficiently satisfied the 'but for' causation in this case" at the summary judgment stage. 546 F. Appx. at 833 n.2. Subsequent Eleventh Circuit cases have clarified the application of *Nassar,* as explained in the text.

(albeit in an unpublished decision carrying persuasive, not binding, authority) held that the district court properly granted summary judgment to the defendant because the plaintiff had not shown but-for causation required to *establish a prima facie case* of hostile work environment where several of the "hostile" incidents of yelling she alleged were by individuals who she had failed to show were even aware she had made an employment discrimination claim, or the yelling incidents had happened *before* she made the discrimination claim. 601 F. App'x at 899-900. In *Trask v. Secretary, Department of Veterans Affairs*, the Eleventh Circuit, citing *Nassar*, affirmed the district court's grant of summary judgment to defendant on the pharmacists' retaliation claims where management had stated eight months before the pharmacists made discrimination complaints that the ones not chosen for promotions would be reassigned to a "float pool." 822 F.3d 1179, 1194-95 (11th Cir. 2016). Because the management had previously decided to reassign the pharmacists who were not promoted to the "float pool," the plaintiffs' protected activity could not have been the but-for cause of their reassignment. *Id.* (citing *Nassar*, 133 S.Ct. at 2534). Based on *Nassar* and it progeny as applied in the Eleventh Circuit, a plaintiff alleging retaliation or retaliatory hostile work environment, who cannot show that retaliation or discrimination was the but-for cause of the adverse action, cannot establish a prima facie case. *Clark*, 601 F. App'x at 900; *Trask*, 822 F.3d at 1194-95.

As part of the causation analysis for a retaliation claim, a court should consider whether the alleged adverse action and the protected activity were close in time. *Higdon v. Jackson*, 393 F.3d 1211, 1220-21(11th Cir. 2004). "[M]ere temporal proximity between . . . knowledge of protected activity and an adverse . . . action . . . must be 'very close.'" *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001). A period of as much as one month between the protected expression and the adverse action is "not too protracted." *Higdon,* 393 F.3d at 1220. However, a period of three months between the protected activity and the alleged retaliation has been held to

be too long a delay to support a causal inference. *See, e.g., Clark County,* 532 U.S. at 273 (citing *Richmond v. ONEOK*, 120 F.3d 205, 209 (10th Cir. 1997) (3-month period insufficient) and *Hughes v. Derwinski*, 967 F.2d 1168, 1174–75 (7th Cir. 1992) (4-month period insufficient)); *Thomas v. CVS/Pharmacy*, 336 F. App'x 913, 915 (11th Cir. 2009) ("Three and a half months is too long a delay to support a causation finding.").

Plaintiff's only "protected activity" which may serve as the basis of a claim of retaliation is Plaintiff's initiation of the EEO complaint with the Marshals Service's internal EEO office. On June 29, 2012, Plaintiff first contacted the EEO office requesting counseling; on July 3, 2012, an EEO counselor was assigned; on September 25, 2012 Plaintiff signed a formal Complaint of Discrimination and it was formally filed with the EEO Office on October 3, 2012. Doc. 46-Ex. A at 37, 53.

Plaintiff testified that he had been disciplined on several occasions between 2005 and mid-2012 based on "false" and "unfounded" allegations concerning his divorce, and he was "harassed" by Marshals Service personnel in the Northern District of Florida since 2003. Plaintiff alleges these disciplinary actions contributed to the "hostile environment" which occurred prior to his initiation of an EEO complaint, and these pre-2012 incidents should be considered "as part of a hostile work environment claim." Doc. 53 at 11.

However, conduct which occurs *prior* to the time an employer is even aware of an EEO charge cannot be considered "in retaliation" and is not actionable as part of a retaliation claim. "At a minimum, a plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took adverse employment action" and such awareness "is the minimum that a plaintiff must demonstrate to establish a *prima-facie* case of retaliation." *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993); *Simmons v. Camden Cty. Bd. of Educ.*, 757 F.2d 1187, 1189 (11th Cir. 1985)). Since it is undisputed that Plaintiff's managers

did not know about his complaint of discrimination to the Marshals Service EEO Office until September 12, 2012, when they were contacted by the EEO office, Plaintiff cannot establish a prima facie case that Defendant *retaliated* against him for the actions taken prior to September 12, 2012, including the failure to assign him to the Acting Supervisor position in June 2012. *See, e.g., Clark v. South Broward Hosp. Dist.*, 601 F. App'x 886, 900 (11th Cir. 2015) (granting summary judgment on retaliatory hostile environment claim where plaintiff failed to present evidence that the two physicians who shouted at her in a meeting were aware of her internal discrimination complaints). "[T]emporal proximity alone is insufficient to create a genuine issue of fact as to causal connection where there is unrebutted evidence that the decision maker did not have knowledge that the employee engaged in protected conduct." *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000) (a decision-maker must have knowledge that the employee engaged in protected activity for a retaliation claim be actionable); *Hudson v. Southern Ductile Casting Corp.*, 849 F.2d 1372, 1376 (11th Cir. 1988) (affirming grant of summary judgment to the defendant on retaliatory discharge claim where there was uncontradicted evidence that the decision makers were unaware of the plaintiff's threat to file an EEOC charge); *McCollum v. Bolger*, 794 F.2d 602, 610-11 (11th Cir. 1986) (affirming judgment for defendant and holding that the plaintiff failed to prove a prima facie case of retaliation where evidence at trial showed that the decision maker did not know that the plaintiff was engaging in protected conduct).

Plaintiff has failed to establish a prima facie case of retaliation for actions taken before September 12, 2012. Although Plaintiff alleges that his October 15-19, 2012 suspension was retaliatory, the suspension had been proposed on July 30, 2012 (for failure to follow procedures in apprehending a fugitive on April 19, 2012) by Assistant Chief Deputy York, and finalized by Marshal Spooner on September 10, 2012–two days before management knew Plaintiff had initiated a discrimination complaint. Accordingly, retaliation could not be the but-for causation of

Plaintiff's October 15, 2012 five-day suspension. Doc. 46-Ex. I at 30-32; Doc. 46-Ex. M at 54-59.

### B.   Discrete acts of retaliation

Plaintiff alleges retaliation in the form of discrete acts of unwarranted disciplinary actions "in the wake of [his] EEO complaint." Doc. 53 at 16. These disciplinary acts include "near continual" internal affairs investigations and suspensions, "increased scrutiny," and negative comments in Plaintiff's personnel file, denial of trainings, loss of out of town security details and special assignments with overtime pay; failure to provide new door breaching equipment; and allegedly harassing statements[33] made to him; culminating with his reassignment to the Southern District of New York in September 2014. Doc. 1 at 7-8.

Turning to the incidents that occurred *after* his supervisors became aware of his EEO complaint on September 12, 2012, Plaintiff contends that he was subjected to at least five or six "excessive and unnecessary" Internal Affairs investigations following his EEO complaint. Doc. 53 at 16. Plaintiff alleges that Wilson's initiation of "between five and six IA investigations against Plaintiff" were adverse actions that allegedly were the result of a retaliation. Prior to his complaint, Plaintiff contends that his performance evaluations were "always positive" and two previous suspensions were "related to his domestic situation," not his performance.

Defendant argues that summary judgment is warranted on Plaintiff's claims that he has been unjustly referred to Internal Affairs and unjustly disciplined as retaliation for filing his EEO Action in light of Plaintiff's long history of disciplinary actions since 2004 and his Internal Affairs investigations predating his EEO Action by many years, which destroys any causal link. Defendant

---

[33]   Plaintiff alleged that Assistant Chief Deputy York bragged to Plaintiff about "beating numerous EEO Complaints"; he also asked Plaintiff in front of other deputies whether there was a "666 on his forehead under a band-aid." Doc. 48-10 ¶ 13, 18. Chief Deputy Brian Nerney expressed to Plaintiff how angry he was that Plaintiff had filed the EEO Complaint. *Id.* at ¶ 14; Doc. 50-1 at 35-36. When Plaintiff complained about hostile treatment, Supervisory Deputy Wilson commented "well, you filed an EEO complaint." Doc. 48-10 ¶ 15. Chief Deputy Nerney rhetorically asked Plaintiff, "What can I do for you Mike? Want my car? Want my job? Want my desk? Do you want the chief's job? Do you want [Wilson's] job? What do you want?" *Id.* at ¶ 19; Doc. 50-1 at 120–23.

points out that Plaintiff has been the subject of at least sixteen (16) USMS Internal Affairs investigations from 1999 through 2014, nine of which occurred prior to 2012, and Plaintiff has been disciplined on no less than nine occasions since 2003, at least five of which were based on events that occurred before 2012. Doc. 46 at 18-19 (Doc. 46-Ex. J at 1-1603).

Although Plaintiff's arguments fail to specify precisely which of the numerous Internal Affairs and discipline investigations he believes were motivated by retaliation, the Court has determined the disciplinary actions finalized after September 12, 2012 include: (1) the January 29, 2013 letter of instruction by Chief Investigator David Sligh for Plaintiff's failure to maintain and secure his Marshals Service badge and credentials on October 23, 2012; (2) the October 21, 2013 letter of instruction by Chief Inspector Cathy Jones arising out of an incident on August 3, 2012, when Plaintiff rode in the front seat of the transport vehicle while moving prisoner Holli Prather; (3) the February 11, 2013 suspension by Chief Inspector Cathy Jones for the June 19, 2012 events involving Deputy Joanos referred on August 1, 2012 to Alonda Guilbeau, Judicial Security Inspector, from the Western District of Louisiana; (4) the investigation that led to Plaintiff's reassignment to New York in September 2014. However, only two of the four investigations listed were referred or begun *after* September 12, 2012, and of those two, one of the investigations was begun on Plaintiff's own report that he had lost his credentials on October 23, 2012. All four of the investigations were performed by inspectors from outside the Tallahassee Office.

Two of the Internal Affairs investigations, finalized on January 29, 2013 and October 31, 2013, resulted in "letters of instruction," which is a lesser consequence than a reprimand, was not considered a disciplinary action, and was not placed in Plaintiff's personnel file. *See* Doc. 46-Ex. A at 327, 428. A written counseling that does not amount to a reprimand which has no effect on an employee's salary and does not impact any of the terms of employment does not constitute an adverse employment action. *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1241-42 (11th Cir.

2001). "[C]riticisms of an employee's job performance—written or oral—that do not lead to tangible job consequences will rarely form a permissible predicate for a [discrimination] suit." *Id.* (citing cases); *accord Allen v. Michigan Dept. of Corrs.*, 165 F.3d 405, 409-10 (6th Cir. 2014) (holding that counseling memoranda, unlike a denial of promotion, did not constitute "materially adverse" employment action even though motivated by racial animus). Accordingly, the two letters of instruction do not constitute actionable "adverse employment actions."

The third Internal Affairs investigation, which resulted in Chief Inspector Jones' February 11, 2013 decision to suspend Plaintiff for ten days in March 2013, arose out of the June 19, 2012 events involving Plaintiff's accusation against a fellow deputy for carrying a knife in the cellblock and Plaintiff subsequently "conducting his own investigation." Coincidentally, this is the same date Plaintiff alleges he learned from Wilson that he was not selected for firearms training; and it was at least three months *prior* to September 12, 2012 when management in the Tallahassee Office learned of Plaintiff's EEO complaint. Thus, retaliation cannot be the but-for causation of the March 2013 suspension. Moreover, both of the Chief Inspectors, Jones and Whitelock, who proposed and made the final decision concerning Plaintiff's punishment after an independent investigation, are employed at the Marshals Service Headquarters; neither is part of the management in the Northern District of Florida or the Tallahassee Office, and neither had any supervisory authority over Plaintiff. Doc. 46-Ex. M at 62-64. "Where a decisionmaker conducts his own evaluation and makes an independent decision, his decision is free of the [potential] taint of a biased subordinate employee." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1269-70 (2001) (citing *Wright v. Southland Corp.*, 187 F.3d 1287, 1304 n. 20 (11th Cir.1999) (finding that biased employee did not manipulate the final decisionmaker); *Willis v. Marion Cty. Auditor's Office*, 118 F.3d 542, 547 (7th Cir.1997) (holding that when "the ultimate decision is clearly made on an independent and a legally

permissive basis, the bias of the subordinate is not relevant").[34]

The fourth investigation which Plaintiff alleges was retaliatory, and led to his eventual transfer to the Southern District of New York in September 2014, was initiated after Plaintiff's co-workers, other operational deputies, sent a letter to the Marshals Service Headquarters on February 10, 2104, alleging they were concerned for their personal safety in the workplace; that Plaintiff had shown a pattern of erratic behavior; and that they had developed safety plans in the event Plaintiff "becomes an active shooter." Doc. 46-Ex. H at 5; Doc. 46-Ex. K at 432-37. On February 24, 2014, Marshals Service Headquarters assigned United States Marshal for the District of Utah Jim Thompson and Chief Inspector Mike Claxton to conduct an on-site office assessment of the Northern District of Florida, Tallahassee Office in response to the February 10, 2014 letter. Doc. 46-Ex. H at 1-12. As in the Internal Affairs investigations, neither Thompson nor Claxton has any supervisory authority over Plaintiff, and neither has worked in the Tallahassee Office at any time, and they conducted an independent investigation. Doc. 46-Ex. H at 1-12. *See Pennington*, 261 F.3d at 1270 (holding that city was not liable for retaliation where an independent supervisor, different from the original one who denied plaintiff the promotion, conducted his own evaluation and made an independent decision to deny the promotion).

On April 14, 2014, Marshal Thompson and Chief Inspector Claxton made their Recommendations to the Marshals Service Human Resources Assistant Director, Katherine Mohan, who ultimately made the decision to reassign Plaintiff to the Southern District of New York. Doc. 46-Ex. F at 26. Defendant argues that the "but-for" causal link is lacking because Plaintiff's managers in the Northern District of Florida had no input or role in determining where

---

[34] The Eleventh Circuit has held that causation may be established when a decisionmaker follows a biased recommendation from a non-decisionmaker without independently investigating the complaint, using the decisionmaker as a mere conduit, or "cat's paw" to give effect to the recommender's discriminatory animus. *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999). Plaintiff in this case has not made a "cat's paw" argument, nor would such an argument be supportable, based on the 1600 pages of Internal Affairs investigations the Court has reviewed. *See* Doc. 46-Ex. J.

Plaintiff would be reassigned. Defendant also argues that Plaintiff has not shown but-for causation because there is no temporal proximity with Plaintiff's initiation of his EEO Action in mid-2012, since two years passed before he was reassigned to the Southern District of New York in September 2014.   Even if the Court considers that the investigation leading to Plaintiff's reassignment was begun at the instigation of Plaintiff's fellow deputies in February 2014, the passage of nearly a year and a half is too long to support a causation finding. *Thomas v. CVS/Pharmacy*, 336 F. App'x 913, 915 (11th Cir. 2009) ("Three and a half months is too long a delay to support a causation finding.").

### C.  Adverse action

Defendant also argues that Plaintiff cannot state a prima facie case arising out of his reassignment to the Southern District of New York in 2014 because it was a lateral transfer. The Eleventh Circuit has adopted the approach of its sister circuits, finding that "a purely lateral transfer, that is, a transfer that does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action." *Doe v. DeKalb Cty. School Dist.*, 145 F.3d 1441, 1449 (11th Cir. 1998). Only when the "transfers" were objectively equivalent to a demotion" have courts found them to be "adverse" actions. *Id.*; *cf. Smith v. Ala. Dept. of Public Safety*, 64 F. Supp. 2d 1215, 1221-1223 (M.D. Ala. 1999) (involuntary lateral reassignment from Selma to Montgomery did not constitute adverse employment action). Here, Plaintiff has not alleged any arguable change in the condition or terms of his lateral transfer to New York at the same grade, salary, and conditions of employment as a deputy marshal beyond his dissatisfaction with leaving his preferred location of Tallahassee, where he would have preferred "to continue to work . . . through his retirement" and where his wife (rejecting the Marshals Service's offer to transfer to New Jersey) and children stayed "because his wife assumed that he would be returned to Tallahassee after the investigation discrimination and retaliation claims ended." Doc. 53 (citing

Doc. 48-10 ¶¶ 37, 38). Plaintiff signed a mobility agreement when he began his employment[35] with the Marshals Service providing that he could be assigned to any USMS district at any time. A federal employee with a mobility agreement can be reassigned to another district and a lateral reassignment to a different locale with no change in salary or benefits is not an adverse action. *Moore v. West*, 2002 WL 449794 at *5 (S.D. Ind. Jan. 25, 2002) (holding that the transfer of a VA employee who signed a mobility agreement when he began work with the VA could not be considered a materially-adverse action and rejecting his suggestion that the agreement had an implied time limit); *Shannon v. BellSouth Communications*, 292 F.3d 712, 716 (11th Cir. 2002) ("Shannon's reassignment [to a different geographic area] does not constitute adverse employment action."). Thus, Plaintiff's lateral transfer or reassignment to another geographic location at the same grade and with the same duties pursuant to the Marshals Service mobility agreement is not an adverse action.

Defendant also argues that many of the changes in job duties about which Plaintiff complains–denial of training, participation in certain security details,[36] and denial of new door breaching equipment–do not amount to adverse employment actions because they lack sufficient evidence of a tangible adverse effect on the terms, conditions or privileges of employment, such as decreases in salary or work hours. Doc. 46 at 15.

Plaintiff alleges that "he has missed promotional opportunities and training opportunities, further hurting his overall promotional and financial opportunities." Doc. 53 at 11 (citing Doc. 48-10 ¶ 41). As explained above with regard to Plaintiff's claims that the denial of firearms and fitness training was discriminatory, Plaintiff's claims that denial of sex offender training on November 6,

---

[35] Plaintiff testified that he signed the mobility agreement at the time he began employment with the Marshals Service. Doc. 46-Ex. P at 90-92.

[36] To the extent Plaintiff argues he was denied the opportunity to earn overtime related to the out of town assignments and security details, the issue is addressed *infra*.

2012 and unspecified trainings between December 2012 and February 2013, as well as denial of more prestigious security details, such as for the Attorney General, which resulted in "missed promotional opportunities"—stated in the abstract—does not constitute an adverse action. *See Davis*, 245 F.3d at 1244-45 (plaintiff's allegation that he was removed from certain duties that "deprived him of valuable experience that might have given rise to more lucrative opportunities . . . [was] made only at the highest order of abstraction; there is no evidence that [he] sought, let alone was denied any opportunity"); *see also Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) ("We speak of *material* adversity because we believe it is important to separate significant from trivial harms. . . We refer to reactions of a *reasonable* employee because we believe that the provision's standard for judging harm must be objective.") (emphasis in original).

Supervisory Deputy Wilson's assignment of the "after-hours phone" to Plaintiff without his knowledge for a few days while he was on leave (Doc. 53 at 17) is not an action which rises to the level of a materially adverse action. *See Reeves v. DSI Sec. Servs., Inc.,* 395 F. App'x 544, 547 (11th Cir. Aug. 31, 2010) ("'[P]etty slights, minor annoyances, and simple lack of good manners' generally do not rise to the level of materially adverse actions.") (quoting *Burlington*, 548 U.S. at 68). Supervisory Deputy Wilson's failure to give Plaintiff door breaching equipment—because he believed Plaintiff already had such equipment—also does not constitute a materially adverse action, in keeping with the majority of district court cases within this Circuit to have addressed the issue. *Graham v. Methodist Home for the Aging*, No. 2:11-CV-1416-SLB, 2012 WL 3637587 (N.D. Ala. Aug. 20, 2012) (holding that denial of equipment, such as an overhead projector, a copier, a laptop computer, and mannequins, that plaintiff had allegedly been promised was not a serious and material change in the terms and conditions of her employment); *Baker v. World Tech. Servs., Inc.*, No. 8:09–cv–2450–T–30AEP, 2011 WL 1466164, 5 (M.D. Fla. Apr.18, 2011) (holding the employer's failure to provide plaintiff a radio was insufficient to establish an adverse

employment action); *Nash v. Palm Beach County School Dist.*, No. 08–80970–CIV, 2010 WL 3220191, *9 (S.D. Fla. Aug.13, 2010) (holding that the denial of a request for training equipment was not an adverse employment action), *aff'd Nash v. Palm Beach Cty. School Dist.*, 469 Fed. App'x 712 (2012); *Head v. Pitts Enter., Inc.*, Civil Action No. 1:09cv187–WHA, 2010 WL 2773376, *14 (M.D.Ala. July 14, 2010) (holding the denial of a radio was not a materially adverse action); *cf. Cantrell v. Jay R. Smith Mfg. Co.*, 248 F. Supp. 2d 1126, 1138 (M.D.Ala. 2003) ("Title VII is not a vehicle to be used by employees to compel their employers to upgrade their technology or training."); *see also Markel v. Bd. of Regents of Univ. of Wis. Sys.*, 276 F.3d 906, 911, 912 (7th Cir. 2002) (holding that the denial of "better" equipment was not a "readily quantifiable loss" the discrimination laws were meant to redress).

Plaintiff also alleges that Chief Deputy Nerney and Supervisory Deputy Wilson retaliated by denying him multiple out-of-town security and detail assignments[37] between November 2012 and February 2013, which caused him a financial loss of overtime. As an initial matter, Marshals Service records contradict Plaintiff's allegation and show that on February 11, 2013, Plaintiff decided to "administratively pass" on a long-term assignment due to an office duty conflict. Doc. 46-Ex. C at 104. In October 2012, Plaintiff was offered a judicial security division detail to Fort Lauderdale, Florida, but Plaintiff declined. Doc. 46-Ex. C at 103. Subsequent to the time period Plaintiff identifies, in July 20, 2013, he was assigned to detail to Jacksonville, Florida. Doc. 46-Ex. M at 74-75; Doc. 46-Ex. C at 108.

To the extent Plaintiff was denied security details or out of town "special assignments" (which Plaintiff fails to distinguish between) for which he lost out on the chance to earn overtime

---

[37] Although Plaintiff alleged in his Complaint that he was retaliated against when he was denied participation in the Fugitive Task Force (Doc. 1 at 7-8), he did not raise this allegation in his Response despite Defendant's argument that he could not establish causation as to the denial of participation in the Fugitive Task Force because he had been denied such participation since 2003 when he joined the Tallahassee Office (Doc. 46 at 17). Having failed to raise it in the Response, the argument is thus waived.

pay, he has failed to show that he regularly received or was entitled to overtime pay that was denied based on retaliation. In the Eleventh Circuit's decision in *Shannon v. Bellsouth Telecomms., Inc.*, 292 F.3d 712 (11th Cir. 2002), a plaintiff established that his employer had "totally blackballed" him from overtime opportunities in retaliation for his discrimination complaint, where the employee testified he typically earned $15,000 to $20,000 annually in overtime, but had earned less than $2,000 following his complaint and all of his coworkers continued to be "called in" for overtime at the same rate. *Id.* at 717; *Bass v. Board of Cnty. Comm.*, 256 F.3d 1095, 1118 (11th Cir. 2001) (employer actions that "deprived [the employee] of compensation which he otherwise would have earned" including overtime, on-call duty, and adjunct teaching pay that he had earned prior to filing his EEOC complaint, constituted adverse employment action), *overruled in part on other grounds by Crawford v. Carroll*, 529 F.3d 961 (11th Cir. 2008). Plaintiff alleges in a general sense that he was denied "overtime pay" (*see, e.g.*, Doc. 53 at 18[38]), but he fails to provide any evidence of the lost overtime, or overtime he had earned prior to the alleged retaliation in September 2012. Moreover, as discussed below, Plaintiff has failed to rebut Defendant's legitimate nondiscriminatory reason for precluding Plaintiff from out of town assignments and security details.

### D. Pretext

Defendant argues that assuming *arguendo* Plaintiff could make out a prima facie case of an adverse employment action and a causal link to his various Internal Affairs investigations, denial of security details and other disciplinary actions that occurred in 2012, Defendant has asserted legitimate non-discriminatory reasons that Plaintiff has not rebutted. The discipline Plaintiff received was based on thorough investigations, witness interviews, and made in the

---

[38] Plaintiff cites to his Affidavit, Doc. 48-10 ¶¶ 27, 32, which refers to "lost overtime" without any detail, and Wilson's deposition, Doc. 48-17 at 23-24, which does not discuss overtime at all.

context of Plaintiff's long disciplinary history. Based on the Court's thorough review of the Internal Affairs investigation records (Doc. 46-Ex. J at 1-1603), it is clear that the Marshals Service had legitimate non-discriminatory reasons for disciplining Plaintiff and for reassigning him to a different district other than the Tallahassee Office, keeping in mind that the Marshals Service was attempting to accommodate Plaintiff's wife (an asset forfeiture investigator), by finding a second nearby position.

The Marshals Service Human Resources Department was actively researching openings and imminent potential openings and retirements—which were not yet posted in the "OPREF" but were "in the works" or "currently vacant that would be posted soon" considering "operational capacity" percentages—in the districts across the country (Doc. 46-Ex. D at 4-6) and had noted openings in the Southern District of New York and District of New Jersey that could accommodate the transfer of Plaintiff's wife (in asset forfeiture). Doc. 46-Exs. D, E. In tandem with Plaintiff's reassignment, the Marshals Service offered to reassign Plaintiff's wife Heather Gloetzner to the District of New Jersey (Newark), with no change in job or grade, but she declined the reassignment. Doc. 46-Ex. D at 1-5, Doc. 46-Ex. E at 1-11; Doc. 46-Ex. F at 28-29; Doc. 48-10 ¶ 37. Plaintiff has not produced any evidence to refute Defendant's legitimate nondiscriminatory reasons for his reassignment to the Southern District of New York (and offer to his wife of reassignment to the District of New Jersey), other his unsupported opinion that "there was actually no opening in the Southern District of New York at the time of [his] transfer" and "there were openings in the Southern and Middle Districts of Florida, [] much closer to [his] home and family." Doc. 48-10 ¶ 36; Doc. 53 at 10.

Defendant has also stated legitimate non-discriminatory reasons for denying Plaintiff participation in trainings and other assignments, and Plaintiff has produced no probative evidence refuting the reasons. Defendant restricted Plaintiff's out of town details for medical reasons

including in August 2012 and February 2014, when the Marshals Service Employee Health Programs restricted Plaintiff from travel and special assignments due to the recommendations of physicians that Plaintiff should be placed on limited duty assignments of a less stressful nature. Doc. 46-Ex. B at 61-67 (August 2012); Doc. 46-Ex. K at 438-42 (February 2014). Plaintiff concedes that the ongoing Internal Affairs investigations "prevented him from attending trainings and details outside the District," as Supervisory Deputy Wilson had testified was the reason. Doc. 53 at 20. Wilson told Plaintiff that policy prevented such assignments while a deputy is under investigation, and that Internal Affairs forbid any training or out of town details. Doc. 46-Ex. M at 33.

Defendant additionally points out that in 2012 and 2013, Plaintiff was unavailable for certain assignments due to numerous days of sick leave, annual leave, suspensions from duty, or personal conflicts. In 2013 Plaintiff used 333 hours of sick leave, 20 hours of workers compensation leave and was suspended for 64 hours. Doc. 46-Ex. H at 11-12. The assignment schedules show that Plaintiff declined special assignments on October 21, 2012 and February 11, 2013 due to personal reasons. Doc. 46-Ex. C at 101-05.

In his Response to Defendant's Summary Judgment Motion, Plaintiff does not point to any probative evidence refuting Defendant's legitimate nondiscriminatory reasons for the denial of assignments and security details, but merely argues in a conclusory fashion that Plaintiff was "singled out" and the Internal Affairs investigations and suspensions were "groundless." Doc. 53 at 19-20. Plaintiff has failed to rebut Defendant's legitimate non-discriminatory reasons for denying him security details and assignments, which included an extensive record of Internal Affairs and Headquarters investigations against him. Accordingly, Defendant is entitled to summary judgment on Plaintiff's retaliation claims.

*E. Retaliatory Hostile Work Environment*

Plaintiff contends that after his EEO Complaint his supervisors began to treat him in "an extremely hostile manner," acknowledging that the EEO complaint was the cause, to the point that another deputy marshal noticed[39]. Plaintiff argues he was singled out, ostracized, and treated in a "hostile" fashion; he contends that Chief Deputy Nerney and Supervisory Deputy Wilson expressed that they were angry that Plaintiff had filed the complaint. Doc. 48-9 at 35-36, 120-23; Doc. 48-10, ¶¶ 14-19; Doc. 48-14, 17-18. Defendant moves for summary judgment on Plaintiff's retaliatory hostile work environment claim arguing that the record contains no evidence of any causal link between the alleged harassment and retaliation for initiating an EEO Action because Plaintiff stated that the harassment began when he was reassigned to the Tallahassee office in 2003. Doc. 46 at 22 (citing Doc. 46-Ex. K at 462 ("Shortly after I got to this office [in 2003] I was told they did not want me hear [sic] and the harassment started. . . . I have been under investigation almost continuously since I arrived in this district")).  Defendant further argues that summary judgment is warranted because Plaintiff's allegations do not amount to sufficiently "severe and pervasive" harassment that unreasonably interfered with his job performance, but were akin to mere offensive utterances.

Assuming without deciding for purposes of this Motion that the supervisors made the statements Plaintiff alleges (which they have denied)—including that they were angry he filed an EEO complaint, made threats they would "beat" the complaint, and "hope[d] the band aid is not covering the 666 on your forehead"—Plaintiff must also show that the statements were sufficiently "severe or pervasive to alter the terms and conditions of employment" such that they created a discriminatorily abusive working environment and that the employer is responsible for such environment. *See Clark v. S. Broward Hosp. Dist.*, 601 F. App'x 886, 898-99 (11th Cir. 2015).

---

[39] Plaintiff cites the testimony of Deputy Kilgore, who was no longer in the squad room, but noticed that as a result of the EEO complaint there was tension in the squad room and that Plaintiff's chain of command placed him "under a microscope." Doc. 48-17 at 12-13, 32-35.

With regard to causation, the plaintiff must show that the protected activity (*e.g.* filing an EEO action) was the but-for cause of the discriminatory or retaliatory hostile work environment. *Clark*, 601 F. App'x at 899.

The Court does not find that the limited number of comments Plaintiff alleges were "severe and pervasive" to constitute a hostile work environment. *McCann v. Tillman*, 526 F.3d 1370, 1378–79 (11th Cir. 2008) (holding instances of racially derogatory language extending over a period of more than two years were "too sporadic and isolated" to establish that employer's conduct was objectively "severe or pervasive"); *Clark,* 601 F. App'x at 900 ("The few instances Plaintiff cites are not sufficiently egregious or frequent to support a claim of a hostile work environment."); *Moore v. Shands Healthcare, Inc.*, 617 F. App'x 924, 927 (11th Cir. 2015) (holding two racially disparaging remarks by visitors, inappropriate jokes by a coworker, and three derogatory remarks made by coworkers over a three-year period and repeated to plaintiff did not constitute a racially hostile work environment); *Baroudi v. Secretary, U.S. Dep't of Veterans Affairs*, 616 F. App'x 899, 905 (11th Cir. 2015) (finding plaintiff had failed to show her work environment was objectively hostile and abusive based on what she perceived to be a "demeaning, threatening, and belittling manner" by offering nothing more than her own vague and conclusory statements to support the claim); *Streeter v. City of Pensacola, Fla.*, 501 F. App'x 882, 885 (11th Cir. 2012) (holding firefighters' hostile work environment claims failed where they had failed to present competent evidence that their job performance was adversely affected by the harassment where each was promoted and moved up the ranks during the relevant time period); *cf. Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1276–77 (11th Cir. 2002) (severe and pervasive conditions existed where co-workers called plaintiff racially offensive names three to four times per day). Moreover, as explained below, in asserting a claim against a federal employer under the ADEA, Plaintiff's damages are limited and do not include recovery of the type typically awarded

for a hostile work environment claim, *i.e.*, non-economic damages for "pain and suffering." *See Comerford v. Potter*, No. 8:08–cv–648–T–33TBM, 2011 WL 6181848 (M.D. Fla. Dec. 13, 2011) (holding that a plaintiff cannot recover compensatory damages for pain and suffering under the ADEA) (citing *Goldstein v. Manhattan Indus., Inc.*, 758 F.2d 1435, 1445 (11th Cir. 1985)).

### 5.  Damages Issues

Defendant moves for summary judgment that Plaintiff cannot recover for non-economic compensatory damages, punitive damages, and attorney's fees. Doc. 46 at 24-25. Defendant also argues that Plaintiff has not alleged any specific economic loss or loss of fringe benefits. Plaintiff devoted just one paragraph in the response to Defendant's entire argument about the damages, and limited to economic damages. Doc. 53 at 18. He argues that he has "alleged economic losses and the loss of fringe benefits sufficient to support an award of money damages," citing to his own affidavit (Doc. 48-10 ¶¶ 21, 27, 32, 41). Doc. 53 at 18. Defendant is entitled to summary judgment that Plaintiff cannot recover for non-economic compensatory damages, punitive damages, and attorney's fees under the ADEA. *See Comerford*, 2011 WL 6181848, *7 (holding "[n]either punitive damages nor compensatory damages for pain and suffering are recoverable under the ADEA," although economic damages are recoverable); *Smith v. Office of Personnel Management*, 778 F.2d 258, 260-61 (5th Cir. 1985) (liquidated damages against the federal government are not available in an ADEA lawsuit brought by a federal employee); *Mitchell v. Chao*, 358 F. Supp. 2d 106, 114 (N.D. N.Y. 2005) (same); *Lewis v. Federal Prison Indus.*, 953 F.2d 1277, 1282 (11th Cir. 1992) ("Congress did not intend to provide this remedy [attorney's fees] for public sector litigants.").

Defendant also argued that according to Plaintiff's claims as pled, it appeared as though he had not alleged any facts that would support the recovery of money damages in this case because he remained employed by the Marshals Service and had not had a reduction in salary, grade, or

benefits. In the paragraphs of his Affidavit cited by Plaintiff in Response, he contends that his October 15, 2012 suspension caused him to "suffer financially due to five days without pay and accrual of benefits," (Doc. 48-10 ¶ 21); and missed "promotional opportunities and training opportunities . . . hurting [his] promotional package and financial opportunities" due to "numerous frivolous investigations" (Doc. 48-10 ¶ 32). For the reasons explained above, Plaintiff cannot state a claim for vague "missed promotions and training opportunities." *See Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1244-45 (11th Cir. 2001) (finding allegation that removal from certain duties had deprived the plaintiff of "valuable experience that might have given rise to more lucrative opportunities" was too abstract). Only one suspension[40] and commensurate loss of pay was imposed after the management in the Tallahassee Office learned of Plaintiff's complaint on September 12, 2012; it arose out of the investigation of Plaintiff's complaint about Deputy Joanos and Plaintiff's review of the security recording of the cellblock from *June* 19, 2012; thus, the investigation by Internal Affairs, and the resulting suspension, could not have been in retaliation. Plaintiff has failed to state a prima facie case for which the only possible damages (economic damages) are recoverable. Defendant is entitled to summary judgment on Plaintiff's claims for damages and attorney's fees.

### V. CONCLUSION

Based on the foregoing, it is ordered as follows:

1. Defendant's Motion for Summary Judgment (Doc. 46) is **GRANTED**.

2. The Clerk is to **DIRECTED** enter a judgment that Plaintiff take nothing on his claims and Defendant recover costs.

3. The Clerk is **DIRECTED** to close the file.

---

[40] Plaintiff does not allege any suspension was a result of age discrimination, only retaliation.

**DONE** and **ORDERED** in Chambers, in Orlando, Florida on December 2, 2016.

ANNE C. CONWAY
United States District Judge

Copies furnished to:

Counsel of Record
Unrepresented Parties